## DAY-BRITE LIGHTING, INC. *v.* MISSOURI.

No. 317.   Argued January 10, 1952.—Decided March 3, 1952.

*Henry C. M. Lamkin* argued the cause for appellant. With him on the brief were *William H. Armstrong* and *Louis J. Portner.*   *Thomas H. Cobbs* was also of counsel.

*John R. Baty,* Assistant Attorney General of Missouri, for appellee.   With him on the brief was *J. E. Taylor,* Attorney General.   *Arthur M. O'Keefe,* Assistant Attorney General, was also of counsel.

*J. Albert Woll, Herbert S. Thatcher* and *James A. Glenn* filed a brief for the American Federation of Labor, as *amicus curiae,* supporting appellee.

Mr. Justice Douglas delivered the opinion of the Court.

Missouri has a statute, Mo. Rev. Stat., 1949, § 129.060, first enacted in 1897, which was designed to end the coercion of employees by employers in the exercise of the franchise.   It provides that an employee may absent him-

self from his employment for four hours between the opening and closing of the polls without penalty, and that any employer who among other things deducts wages for that absence is guilty of a misdemeanor.[1]

Appellant is a Missouri corporation doing business in St. Louis. November 5, 1946, was a day for general elections in Missouri, the polls being open from 6 A. M. to 7 P. M. One Grotemeyer, an employee of appellant, was on a shift that worked from 8 A. M. to 4:30 P. M. each day, with thirty minutes for lunch. His rate of pay was $1.60 an hour. He requested four hours from the scheduled work day to vote on November 5, 1946. That request was refused; but Grotemeyer and all other employees on his shift were allowed to leave at 3 P. M. that day, which gave them four consecutive hours to vote before the polls closed.

Grotemeyer left his work at 3 P. M. in order to vote and did not return to work that day. He was not paid for the hour and a half between 3 P. M. and 4:30 P. M. Appellant was found guilty and fined for penalizing Grotemeyer in violation of the statute. The judgment was affirmed by the Missouri Supreme Court, 362 Mo. 299, 240

[1] "Any person entitled to vote at any election in this state shall, on the day of such election, be entitled to absent himself from any services or employment in which he is then engaged or employed, for a period of four hours between the times of opening and closing the polls; and such voter shall not, because of so absenting himself, be liable to any penalty; provided, however, that his employer may specify the hours during which such employee may absent himself as aforesaid. Any person or corporation who shall refuse to any employee the privilege hereby conferred, or shall discharge or threaten to discharge any employee for absenting himself from his work for the purpose of said election, or shall cause any employee to suffer any penalty or deduction of wages because of the exercise of such privilege, or who shall, directly or indirectly, violate the provisions of this section, shall be deemed guilty of a misdemeanor, and on conviction thereof be fined in any sum not exceeding five hundred dollars."

S. W. 2d 886, over the objection that the statute violated the Due Process and the Equal Protection Clauses of the Fourteenth Amendment and the Contract Clause of Art. I, § 10.

The liberty of contract argument pressed on us is reminiscent of the philosophy of *Lochner* v. *New York,* 198 U. S. 45, which invalidated a New York law prescribing maximum hours for work in bakeries; *Coppage* v. *Kansas,* 236 U. S. 1, which struck down a Kansas statute outlawing "yellow dog" contracts; *Adkins* v. *Children's Hospital,* 261 U. S. 525, which held unconstitutional a federal statuté fixing minimum wage standards for women in the District of Columbia, and others of that vintage. Our recent decisions make plain that we do not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare. The legislative power has limits, as *Tot* v. *United States,* 319 U. S. 463, holds. But the state legislatures have constitutional authority to experiment with new techniques; they are entitled to their own standard of the public welfare; they may within extremely broad limits control practices in the business-labor field, so long as specific constitutional prohibitions are not violated and so long as conflicts with valid and controlling federal laws are avoided. That is the essence of *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379; *Nebbia* v. *New York,* 291 U. S. 502; *Olsen* v. *Nebraska,* 313 U. S. 236; *Lincoln Union* v. *Northwestern Co.,* 335 U. S. 525; and *California Auto. Assn.* v. *Maloney,* 341 U. S. 105.

*West Coast Hotel Co.* v. *Parrish, supra,* overrruling *Adkins* v. *Children's Hospital, supra,* held constitutional a state law fixing minimum wages for women. The present statute contains in form a minimum wage requirement. There is a difference in the purpose of the legislation. Here it is not the protection of the health and morals of the citizen. Missouri by this legislation has sought

to safeguard the right of suffrage by taking from employers the incentive and power to use their leverage over employees to influence the vote. But the police power is not confined to a narrow category; it extends, as stated in *Noble State Bank* v. *Haskell,* 219 U. S. 104, 111, to all the great public needs. The protection of the right of suffrage under our scheme of things is basic and fundamental.[2]

The only semblance of substance in the constitutional objection to Missouri's law is that the employer must pay wages for a period in which the employee performs no services. Of course many forms of regulation reduce the net return of the enterprise; yet that gives rise to no constitutional infirmity. See *Queenside Hills Co.* v. *Saxl,* 328 U. S. 80; *California Auto. Assn.* v. *Maloney, supra.* Most regulations of business necessarily impose financial burdens on the enterprise for which no compensation is paid. Those are part of the costs of our civilization. Extreme cases are conjured up where an employer is required to pay wages for a period that has no relation to the legitimate end. Those cases can await decision as and when they arise. The present law has no such infirmity. It is designed to eliminate any penalty for exercising the right of suffrage and to remove a practical obstacle to getting out the vote. The public welfare is a broad and inclusive concept. The moral, social, eco-

---

[2] Decisions contrary to that of the Missouri Supreme Court in this case have been rendered by the Court of Appeals of Kentucky in *Illinois Central R. Co.* v. *Commonwealth,* 305 Ky. 632, 204 S. W. 2d 973, and by the Supreme Court of Illinois in *People* v. *Chicago, M. & St. P. R. Co.,* 306 Ill. 486, 138 N. E. 155. But cf. *Zelney* v. *Murphy,* 387 Ill. 492, 56 N. E. 2d 754. The Appellate Division of the Supreme Court of New York in *People* v. *Ford Motor Co.,* 271 App. Div. 141, 63 N. Y. S. 2d 697, and the Appellate Department of the Superior Court of California in *Ballarini* v. *Schlage Lock Co.,* 100 Cal. App. 2d 859, 226 P. 2d 771, held in accord with Missouri. For a review of legislation in this field, see 47 Col. L. Rev. 135.

nomic, and physical well-being of the community is one part of it; the political well-being, another. The police power which is adequate to fix the financial burden for one is adequate for the other. The judgment of the legislature that time out for voting should cost the employee nothing may be a debatable one. It is indeed conceded by the opposition to be such. But if our recent cases mean anything, they leave debatable issues as respects business, economic, and social affairs to legislative decision. We could strike down this law only if we returned to the philosophy of the *Lochner, Coppage,* and *Adkins* cases.

The classification of voters so as to free employees from the domination of employers is an attempt to deal with an evil to which the one group has been exposed. The need for that classification is a matter for legislative judgment (*American Federation of Labor* v. *American Sash Co.,* 335 U. S. 538), and does not amount to a denial of equal protection under the laws.

*Affirmed.*

Mr. Justice Frankfurter concurs in the result.

Mr. Justice Jackson, dissenting.

The constitutional issue in this case, if not very vital in its present application, surely is a debatable one. Two state courts of last resort, the only ones to consider similar legislation, have held it unconstitutional.[1] Only unreviewed decisions of intermediate courts[2] can be cited in support of the Court's holding.

---

[1] *Illinois Central R. Co.* v. *Commonwealth,* 305 Ky. 632, 204 S. W. 2d 973; *People* v. *Chicago, M. & St. P. R. Co.,* 306 Ill. 486, 138 N. E. 155. Cf. *Zelney* v. *Murphy,* 387 Ill. 492, 56 N. E. 2d 754.

[2] *People* v. *Ford Motor Co.,* 271 App. Div. 141, 63 N. Y. S. 2d 697; *Ballarini* v. *Schlage Lock Co.,* 100 Cal. App. 2d 859, 226 P. 2d 771.

Appellant employed one Grotemeyer, under a union contract, on an hourly basis at $1.60 per hour for each hour worked. He demanded a four-hour leave of absence, with full pay, on election day to do campaigning and to get out the vote. It is stipulated that his residence was 200 feet from the polling place and that it actually took him about five minutes to vote. Appellant closed the day's work for all employees one and one-half hours earlier than usual, which gave them the statutory four hours before the polls closed. For failure to pay something less than $3 for this hour and a half which Grotemeyer did not work and for which his contract did not provide that he should be paid, the employer is convicted of crime under the statute set forth in the Court's opinion.

To sustain this statute by resort to the analogy of minimum wage laws seems so farfetched and unconvincing as to demonstrate its weakness rather than its strength. Because a State may require payment of a minimum wage for hours that are worked it does not follow that it may compel payment for time that is not worked. To overlook a distinction so fundamental is to confuse the point in issue.

The Court, by speaking of the statute as though it applies only to industry, sinister and big, further obscures the real principle involved. The statute plainly requires farmers, small service enterprises, professional offices, housewives with domestic help, and all other employers, not only to allow their employees time to vote, but to pay them for time to do so. It does not, however, require the employee to use any part of such time for that purpose. Such legislation stands in a class by itself and should not be uncritically commended as a mere regulation of "practices in the business-labor field."

Obtaining a full and free expression from all qualified voters at the polls is so fundamental to a successful representative government that a State rightly concerns it-

self with the removal of every obstruction to the right and opportunity to vote freely. Courts should go far to sustain legislation designed to relieve employees from obligations to private employers which would stand in the way of their duty as citizens.

But there must be some limit to the power to shift the whole voting burden from the voter to someone else who happens to stand in some economic relationship to him. Getting out the vote is not the business of employers; indeed, I have regarded it as a political abuse when employers concerned themselves with their employees' voting. It is either the voter's own business or the State's business. I do not question that the incentive which this statute offers will help swell the vote; to require that employees be paid time-and-a-half would swell it still more, and double-time would do even better. But does the success of an enticement to vote justify putting its cost on some other citizen?

The discriminatory character of this statute is flagrant. It is obvious that not everybody will be paid for voting and the "rational basis" on which the State has ordered that some be paid while others are not eludes me. If there is a need for a subsidy to get out the vote, no reason is apparent to me why it should go to one who lives 200 feet from his polling place but not to a self-employed farmer who may have to lay down his work and let his equipment idle for several hours while he travels several miles over bad fall roads to do his duty as a citizen. If he has a hired man, he must also lose his hand's time and his pay. Perhaps some plan will be forthcoming to pay the farmer by requiring his mortgagee to rebate some proportion of the interest on the farm mortgage if he will vote. It would not differ in principle. But no way occurs to me by which the doctor can charge some patient or the lawyer some client for the call he could not receive while he was voting.

I suppose a State itself has considerable latitude to offer inducements to voters who do not value their franchise enough to vote on their own time, even if they seem to me corrupting or discriminating ones. Perhaps my difficulty with today's decision is that I cannot rise above an old-fashioned valuation of American citizenship which makes a state-imposed pay-for-voting system appear to be a confession of failure of popular representative government.

It undoubtedly is the right of every union negotiating with an employer to bargain for voting time without loss of pay. It is equally the right of any individual employee to make that part of his hire. I have no reason to doubt that a large number of voters already have voluntary arrangements which make their absence for voting without cost. But a constitutional philosophy which sanctions intervention by the State to fix terms of pay without work may be available tomorrow to give constitutional sanction to state-imposed terms of employment less benevolent.