**Levin  v.  Philadelphia**

*Norman H. Fuhrman,* for plaintiffs.

*James L. Stern,* Deputy City Solicitor, *Jerome J. Shestack,* Assistant City Solicitor, *Abraham L. Freedman,* City Solicitor, for defendant.

SLOANE, J., October 14, 1955.—Plaintiffs are merchants and store owners in the area which borders Independence Hall, Independence Mall and Independence National Historical Park (the Independence Mall

Area). They brought this equity suit against the Mayor of Philadelphia, the commissioner of licenses and inspections and the members of the Art Commission of Philadelphia. Plaintiffs' effort is to have us set aside, as unconstitutional, a Philadelphia ordinance effective July 29, 1954, which, in a word, in part, subjects present and future signs and other advertising structures in the Mall area, their design, construction, erection and maintenance, to the approval ("reasonable degree of control" says the preamble-title) by the art commission.

The city solicitor, for all defendants, filed preliminary objections, basically that the ordinance is good constitutionally; therefore, there is no cause of action. (The objection as to lack of equity jurisdiction, the city solicitor quit at argument.)

Plaintiffs say, and what they say is fact at this procedural point: The signs have been there and on the buildings for years; they mean a substantial sum in investment; they mean and are a universal method of submitting their wares, in competition with business men close by, who happen to be beyond the Mall area and the street limits set down by the ordinance; without signs the process of competition is weakened and plaintiffs will suffer.

Independence Mall (if I may, I shall call it that for short as most of us do) is a joint undertaking of our Federal, State and city governments. The cost is substantial and worth it, for the purpose is most estimable and easy to see and understand, to preserve in heritage as a National and world historic shrine, Independence Hall and other historic places. Bearing on this purpose, city council passed, and the mayor approved, the ordinance to preserve the historical character of the structures and the Mall, to prevent the impairment of or injury to their architectural

and cultural values and to provide a reasonable degree of control over buildings and signs. As to signs, the matter here, sections 3.1 and 3.2 have immediate pertinence.[1]

Plaintiffs assert the ordinance contravenes constitutional provisions and they lay hold of the property clauses of our State Constitution (article I, secs. 1, 9, 17) and the due process clause of our Federal Constitution (Fourteenth Amendment). The city addresses itself to a proper exercise of the police power.

Perhaps historically it is enough to say, as Holmes suggests, that: "Property is protected because such protection answers a demand of human nature, and therefore takes the place of a fight": Davis v. Mills, 194 U. S. 451, 457. But whatever the urge for the postulate, it is so, that since the day property got to be freely alienable, a man's right to it is inalienable, to the measure "recognized by all as a sacred, absolute, inviolable right": Lord Appeal, 368 Pa. 121, 124; Medinger Appeal, 377 Pa. 217, 220-21. But the postulate, like most, is not absolute. An owner must look to the

---

[1] "Section 3. Signs.

"3.1. No person shall erect or maintain any sign or other advertising structure or device on or extending over any street immediately bounding the Park: *Provided,* That this section shall not apply to any sign placed on the front of any building giving in words and/or numerals the name and brief description of the nature of the business or businesses transacted therein.

"(a) Where such sign is not larger than ten square feet and does not project more than twelve inches from the face of the building; or

"(b) Where a larger sign is specifically authorized by the Commission as not being inconsistent with the purpose of this ordinance.

"3.2. No person shall erect or maintain any sign, billboard, roof sign, or other advertising structure or device elsewhere within one hundred and fifty (150) feet of any street bounding the Park and which is visible from any point within such boundary lines unless he has first obtained a permit so to do from the Department."

plenary presence of public use, public subordination and the continuing competency of public welfare and police power. The community may need another school or playground and an owner must recede from ownership. See Winger v. Aires, 371 Pa. 242.

I should think we can take as so that what the city proposes to do, in this regard of signs, is and must turn out to be burdensome and expensive to these plaintiffs and other vicinity property owners. But we must lay that consideration aside not as trivial, but as outweighed, if the city has the right to do what it proposes to do. "We may not test in the balances of judicial review the weight and sufficiency of the facts to sustain the conclusion of the legislative body, nor may we set aside the ordinance because compliance with it is burdensome": Standard Oil Co. v. Marysville, 279 U. S. 582, 586.

The right of the city depends on the pervading idea of general welfare, the final cause of law. Traditionally, that concept embraces public health, safety, morals. Where the legislative effort toward regulation was not related to these public ends, as is said, with "no rational relation to public health, safety, morals, or welfare", the legislation was stricken. See, for example, Gambone v. Commonwealth, 375 Pa. 547; White's Appeal, 287 Pa. 259. And if property is not properly affected or diminished in use, and is taken, then reasonable compensation must be made for such taking: Lord Appeal, 368 Pa. 121, 125; White's Appeal, 287 Pa. 259.

But, "The concept of the public welfare is broad and inclusive. See Day-Brite Lighting, Inc., v. Missouri, 342 U. S. 421, 424. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as

healthy, spacious as well as clean, well-balanced as well as carefully patrolled": Berman v. Parker, 348 U. S. 26, 33. See also Eubank v. Richmond, 226 U. S. 137. And I should think that is the concept here, not, as the city argues, health and safety. There is illogic remoteness in the argument that the signs take away from health or saefty or that they add to the blight of a blighted district: Cusack Co. v. City of Chicago, 242 U. S. 526. But yet again we deal here with a sacred imponderable, not with abstract theory. We deal here with a heritage, and our tradition, going as it does to deep sentiment, counts for more than logic. See Laurel Hill Cemetery v. San Francisco, 216 U. S. 358, 366.

The ordinance is in two parts, that relating to signs, in issue here, and a second section relating to buildings to be erected in this area in the future. While the argument that the area is blighted might have some merit in relation to the second part of the ordinance, it is not germane to the issue of sign regulation. The averments of the complaint that heretofore these signs have complied with all existing health and safety regulations would appear to have closed the question of regulation on the basis of the need of safety. We are faced rather with the question whether regulation whose primary end is esthetic may be labeled a proper exercise of police power in a location intensely vested with a National historic interest.

Esthetic value is a new and aspiring perception in the law and its acknowledgment through unveiled regulation seeks acceptance. The courts to now have not lent their full approval to legislation whose sole basis is improvement, the reward of which is beauty with the generalization in esthetics: Unaesthetic Sights as Nuisances, 25 Cornell L. R. 1. It has been reiterated in our State: Regulation grounded entirely on esthetic considerations is invalid: Liggett's Petition, 291 Pa. 109, 118; Lord Appeal, 368 Pa. 121, 128; Medinger

Appeal, 377 Pa. 217, 226; Dobison v. Zoning Board of Adjustment, 87 D. & C. 172, 181.

The Pennsylvania view in this area may be traced through the billboard and zoning legislation cases. The early case of Bryan v. City of Chester, 212 Pa. 259, is, in our search, the first to deal with the issue. The City of Chester, by ordinance, prohibited the future erection of billboards in the city because such billboards were very often unsightly and nuisances. The court ruled the ordinance unconstitutional.

The philosophy of the Bryan case changed somewhat in Liggett's Petition, 291 Pa. 109. In that case, zoning legislation which forbade the erection of advertising billboards in certain residential areas was challenged as being unconstitutional. The court indicated that while prohibition of billboard advertising solely on esthetic grounds was invalid, with the advent and approval of zoning legislation, esthetics began its own impress. The Bryan case dealt with an ordinance placing a blanket prohibition on an entire municipality without regard to particular conditions existing in designated or zoned districts. But with the recognition of zoning legislation as a valid exercise of the police power, the court held that esthetic considerations might be given weight in determining the reasonableness of zoning legislation. The court quoted the language of the United States Supreme Court in St. Louis Poster Adv. Co. v. St. Louis, 249 U. S. 269, 274: " 'The incidental consideration of a question of esthetics will not invalidate the exercise of the police power when the particular regulation is founded on other substantial grounds.' "

Billboards contiguous to highways have been deemed the proper subject of legislative control because they are a potential source of danger to the traveler on the highway, constitute fire hazards and may produce unsanitary conditions. With these justi-

fications for control, incidental considerations of esthetics would not invalidate such legislation: Cusack Co. v. Chicago, 242 U. S. 526. One court put it neatly: "Beauty may not be queen but she is not an outcast beyond the pale of protection or respect. She may at least shelter herself under the wing of safety, morality or decency": Perlmutter v. Greene, 259 N. Y. 327, 332, 182 N. E. 5, 6.

Esthetics as a factor in sustaining regulatory legislation where it was incidental to another primary consideration may show a slow drift to eventual recognition of esthetics as a sole criterion justifying regulation in the public interest. Perhaps the mutations of time will render it so. As yet no appellate court has reached that far corner.[2] It is clear that the Pennsylvania courts are committed to the proposition that some other valid reason for regulation must be found before the issue of esthetics will be considered: Medinger Appeal, 377 Pa. 217; Kerr's Appeal, 294 Pa. 246.

But we need not be gratuitous and go that far. We have here a value unique that needs no precedent nor establishes one.

It is helpful to look at the spirit and motives of the Mall project and projects of like nature in other parts of the country. The direction has been, as the years grow, to preserve and beautify places of historic interest. To that end, legislation has been enacted to prevent the deterioration of famous districts and to develop these areas as places of National historic interest. Ordinances exist in the City of Alexandria,

---

[2] Some lower court cases, one in Pennsylvania, have said that esthetic considerations alone will justify regulation: Commonwealth v. Trimmer, 53 Dauph. Co. 91; Preferred Tires v. Hempstead, 19 N. Y. S. 2d 374. The recent Wisconsin case of State v. Weiland, 269 Wis. 262, 69 N. W. 2d 217, seems to go very far in considering esthetics as a basis of regulation. The recent Pennsylvania case of Medinger Appeal, 377 Pa. 217, appears to be directly contrary to the Wisconsin view.

Virginia (Ordinance No. 470, dated July 2, 1940); the City of Williamsburg, Virginia (Zoning Ordinance adopted 1947, sec. 32 et seq.); the City of Annapolis, Maryland (Zoning Ordinance dated June 9, 1952); the City of Winston-Salem, North Carolina (Zoning Ordinance, dated December 21, 1948); the City of Niagara Falls, New York (Zoning Ordinance, adopted March 5, 1951, sec. 8), and the City of St. Croix, Virgin Islands (Municipal Council Bill No. 85, dated December 7, 1951).

The Independence Mall project is an outstanding example of such activity. It differs in this respect from the projects mentioned. Most of the historic area legislation concerns itself with the preservation of an existing area; the Indepence Mall project is directed in the main to secure an appropriate setting for Independence Hall and other historic sites. This has involved the purchase of properties, expenditures of large sums, razing of buildings and construction of parks. Independence Hall is located in the heart of an old business area. The buildings already demolished and those to be demolished are commercial properties; the properties remaining are commercial properties: The Independence Mall, Report of the Joint State Government Commission to the General Assembly of the Commonwealth of Pennsylvania, Session of 1951.

Historic area legislation in other localities took the form of zoning legislation, legislation which set aside a special area of the city and erected rules of regulation with respect to property to be constructed or altered. The legislation in no way impinges upon pre-existing rights and in that respect differs from the Philadelphia sign legislation, designed as it is to regulate existing and future signs wholly on private property.

One ordinance has set up a scheme of regulation similar in scope to the Philadelphia ordinance. Article

XIV, sec. 22A, of the Louisiana Constitution, Act No. 139 of 1936, authorizes establishing by the City of New Orleans of a Vieux Carre section of New Orleans. Pursuant to such authorization the commission council of the city adopted Ordinance No. 14,538 CCS, in 1937. This ordinance, inter alia, forbade the maintenance or erection of advertising signs in the Vieux Carre section of New Orleans without first obtaining a permit from the commission, though the constittuional authorization for the creation of the commission contained no mention of sign regulation. The ordinance's validity was challenged in New Orleans v. Pergament, 198 La. 852, 5 So. 2d 129. There petitioner, owner of a commercial property without historic value fronting on the Vieux Carre section, was refused a permit to display an advertising sign on his property. The ordinance was sustained as a valid exercise of the police power, the court saying: "Preventing or prohibiting eyesores in such a locality is within the police power and within the scope of this municipal ordinance."

The court reaffirmed the validity of the sign legislation in City of New Orleans v. Levy, 223 La. 14, 64 So. 2d 798. The language is apt:

"Finally, defendant takes the position that 'Article XIV, Section 22A of the Louisiana Constitution and the ordinances enacted pursuant thereto are unconstitutional since they are enacted solely for esthetic purposes and are not within the police power'. Perhaps esthetic considerations alone would not warrant an imposition of the several restrictions contained in the Vieux Carre Commission Ordinance. But, as pointed out in the Pergament case, this legislation is in the interest of and beneficial to the inhabitants of New Orleans generally, the preserving of the Vieux Carre section being not only for its sentimental value but

also for its commercial value, and hence it constitutes a valid exercise of the police power. . . ."

In Massachusetts, a similar problem was dealt with in General Outdoor Advertising Co. v. Department of Public Works, 289 Mass. 149, 193 N. E. 799, where the court concerned itself with a number of cases challenging the validity of several local ordinances enacted under the authority of article 50 of the Amendments to the Massachusetts Constitution. This article provides that: "Advertising on public ways, in public places and on private property within public view may be regulated and restricted by law." One of the consolidated cases concerned a historic site whose fame is National. The Department of Public Works of Boston, after hearing, refused to renew a permit to maintain an electrical sign on the roof of a building facing the State House and Common, for which it had previously granted a permit. The refusal to renew the permit was challenged, inter alia, as not being a proper exercise of the police power and a violation of the Federal Constitution. The court ruled that a regulation designed to preserve and conserve historic sites and places of unusual scenic beauty was a proper exercise of the police power authorized by article 50 and not in conflict with any provision of the Federal Constitution. It found the sign to be an "inappropriate and obnoxious intrusion into that locality, and especially that it was a serious detriment and affront to the dignity of the Commonwealth because of its close proximity to the State house". Here, again, is apt language, page 187:

"Even if the rules and regulations of billboards and other advertising devices did not rest upon the safety of public travel and the promotion of the comfort of travellers, . . . we think that the preservation of scenic beauty and places of historical interest would be a sufficient support for them. Considerations of

taste and fitness may be a proper basis for action in granting and in denying permits for locations for advertising devices."

These cases show a broadening of the scope of public welfare to embrace the preservation and maintenance of historic sites as a proper subject of regulation. The instances of adjudication in this area uphold the public interest in preserving historic sites. The reasons advanced in justfication include:

1. The protection of the dignity of the State and its citizens by fitting preservation of great symbols of its heritage.

2. The promotion of patriotism.

3. The commercial advantage of maintaining such sites as an attraction to out-of-State tourists who, in coming here, add to the financial benefit and welfare of the citizenry.

One could say that sign regulation in historic areas is not within the accepted definition of public welfare. But public welfare is the interplay of large and primary forces of social interest and cannot be in precise balance or remain inchoate for too long, so that:

"Restrictions which years ago would have been deemed intolerable and in violation of the property owners' constitutional rights are now desirable and necessary.": General Outdoor Adv. Co. v. Indianapolis, 202 Ind. 85, 172 N. E. 309. See Berman v. Parker, 348 U. S. 26, supra.

Though the path is new and untried in Pennsylvania, I tread it, and the final conclusion in this instance is clear. The prevention of unsightly advertising, the need for external excellence in the Independence Mall area is within the legislative domain of the city. Such control is justified by:

1. The interest of the Nation, the Commonwealth and the city in maintaining the symbols of our historic past, the hallowed site of the Independence Hall area.

2. The growing trend throughout the Nation toward preservation and conservation of our historic sites.

3. The commercial benefit to be served through attraction of visitors to the city.

Plaintiffs in their complaint also question the delegation of regulatory powers to the art commission by the ordinance. The powers of the art commission are delineated in section 5-903 of the Philadelphia Home Rule Charter. No enumerated power extends to the art commission the power to administer or supervise signs wholly on private property. The specifically delegated powers of the art commission extend to objects invested with a public character, e. g., art works acquired by the city, public buildings constructed with funds from the city treasury, structures on private property extending over public highway.

The predecessor of the art commission, the art jury, had no power to control or regulate objects wholly on private property, but its power was plenary with regard to extensions over into the highway. Thus, in Walnut and Quince Street Corporation v. Mills, 303 Pa. 25, it was held that the art jury had full authority to refuse a permit to build a theatre marquee extending over the highway, solely on esthetic grounds. The "public" feature of the proposed structure, i. e., its extension over the highway, gave the art jury full sway over it though requirements for health and safety were met. There was dictum that the art jury had no authority over objects wholly on private property because the legislature had given it no such power. See also Nierenberg v. R. C. Maxwell Co., 76 Pa. Superior Ct. 295, 297.

The powers given the art commission follow with similarity those possessed by the art jury. However, the Philadelphia Home Rule Charter provides in section 2-305:

"Section 2-305. Legislation Affecting Powers and Duties of the Executive and Administrative Branch.

"The Council may by ordinance add new powers and new duties, not inconsistent with the scheme of this charter, to the powers and duties of the offices, departments, boards and commissions which are herein designated as the agencies of the executive and administrative branch of the City Government, but it shall not, except as herein provided, increase the number of such agencies nor shall it abolish any agency unless the agency no longer has any functions to perform."

The apparent purpose of this section of the charter is to meet future needs and to provide for additional powers as the needs arise, with these powers to be placed within the executive or administrative branches of the city government. Obviously there are limits to any new powers to be conferred by city council upon existing agencies. The standard set up by the charter is that such new power must not be "inconsistent with the scheme of this charter". Here the significance of the power to regulate signs in the Mall area is not whose bestowal it is but whether city council could legitimately provide for sign regulation in the Mall area at all.

Once it is determined that city council can legislate in this area, it seems clear the art commission is the agency in reason to be vested with the power in that it oversees the cultural and artistic features of public property.

In their complaint plaintiffs point to the standard of regulation set up by the ordinance as vague and arbitrary. The ordinance provides in section 3.3 that no permit for a sign issue unless the sign: "(b) Has been approved by the Commission as complying with the intent and purpose of this ordinance of insuring the preservation of the historical character

of and spirit of this national shrine and a style in harmony with its buildings."

Once it is determined the right to regulate exists, the standard set up by the ordinance is sufficiently definitive. In this era of increasing administrative activity, standards less specific are given judicial approval. As was said in the recent Pennsylvania case of Weaverland Ind. School District Case, 378 Pa. 449, 455: "It is difficult to imagine how the legislature could have more explicitly expressed its intention. . . ."

Extensive citation of authority is not required to dispose of this contention of plaintiffs. Cases like Yakus v. United States, 321 U. S. 414, and American Power & Light Co. v. Securities and Exchange Commission, 329 U. S. 90, have made it clear that the legislature need not spell out precisely the nature of the power delegated, especially where the subject matter admits of no precise definition.

Defendants' preliminary objection no. 2 is sustained; plaintiff's complaint in equity is dismissed.

The parties shall pay their own costs.