NORMAND SMITH and NANCY L. SMITH, Appellants

v.

GOVERNMENT OF THE VIRGIN ISLANDS,

and

HARVEY ALUMINUM (INCORPORATED)

and

HARVEY ALUMINA VIRGIN ISLANDS, INC.,
Interveners

HARRY NEUMANN, Appellant

v.

GOVERNMENT OF THE VIRGIN ISLANDS,
HARVEY ALUMINA VIRGIN ISLANDS, INC.

and

HARVEY ALUMINA (INCORPORATED)

Nos. 14,535, 14,536

United States Court of Appeals

Third Circuit

Argued October 11, 1963*

Decided February 28, 1964

*See, also, 329 F.2d 135*

---

*The appeal was submitted for disposition on November 19, 1963 when the last of the parties' briefs was filed.

497

WARREN H. YOUNG, JOHN D. MARSH, St. Croix, Virgin Islands, *for appellants*

FRANCISCO CORNEIRO, Attorney General, St. Thomas, Virgin Islands, *for Harvey Aluminum and Harvey Alumina Virgin Islands*

JAMES E. NICKERSON, New York, New York, *for Harvey, etc.*

Before KALODNER, STALEY and SMITH, *Circuit Judges*

KALODNER, *Circuit Judge*

These appeals are from an Order of the District Court dismissing, for failure to state a claim upon which relief can be granted, two consolidated separate taxpayer suits brought by the appellants to enjoin the performance by the Government of the Virgin Islands ("Government") of an Agreement, ratified and adopted by Act 814[1] of the Legislature of the Virgin Islands, with Harvey Alumina Virgin Islands, Inc. ("Harvey")[2] relating to the development by

---

[1] Act 814 was enacted by the Virgin Islands Legislature on February 19, 1962 and approved by the Governor of the Virgin Islands on February 20, 1962.

[2] Harvey Alumina Virgin Islands, Inc., a Virgin Islands Corporation, is a wholly-owned subsidiary of Harvey Aluminum (Incorporated), a California corporation.

Harvey, on the Island of St. Croix, of a $25,000,000 alumina[3] plant, including a deep-water access channel and turnabout area.

The pertinent provisions of the Agreement may be highlighted as follows: Government was (1) to convey to Harvey as site for the alumina plant, subject to the approval of the Federal Aviation Agency of the United States, some 700 acres known as Airport Land, as to which it held a restricted title,[4] and such title as it had in a 500-acre salt water marshland described as Krause Lagoon;[5] (2) to grant Harvey certain tax exemptions and subsidies for a 16-year period;[6] (3) to "use its best efforts" to enable

[3] Alumina, a white odorless powder refined from bauxite ore, is the base material from which aluminum is derived.

[4] The United States made a gift of a restricted title to Airport Land to the Municipality of St. Croix on November 22, 1948, pursuant to the Surplus Property Act of 1944, 58 Stat. 765, as amended, 61 Stat. 678–79, 50 App. U.S.C.A. § 1622(g)(2)(A); title of the Municipality of St. Croix was later vested in the Government of the Virgin Islands by the Revised Organic Act of the Virgin Islands, 68 Stat. 497, 502–3, 48 U.S.C.A. § 1576.

Under the Surplus Property Act of 1944 Government could not convey its restricted title to Airport Land without the approval of the United States. On May 16, 1962, the Federal Aviation Agency approved the conveyance of Airport Land to Harvey subject to an easement not here relevant.

[5] The record establishes that title to the Krause Lagoon tract was acquired by Government from one H. Bingham Hark in January 1963 — subsequent to the execution of the Agreement — on payment of $6,100 by Harvey to Hark.

[6] The Agreement contained these provisions with respect to tax exemptions and subsidies accorded to Harvey by Government:

"Section 9. Tax Exemptions and Subsidies.

"(A) Harvey and such of its Affiliates as are engaged in constructing, owning and/or operating, in whole or in part, the Plant and Related Facilities shall for a period of sixteen (16) years from the Approval Date be exempt from payment of all taxes, excises, duties, imposts and exactions imposed by or with the consent of the Government, or any subdivision, agency, or instrumentality thereof, on construction, ownership, operation, maintenance, expansion or other activity in respect of the Plant and Related Facilities and the raw materials, work in process and products thereof (including importing, exporting, loading, unloading, processing, production and sale of bauxite, alumina, any compound or combination of either of them, or any other raw material or products of, or any equipment or machinery imported for use at, the Plant and Related Facilities). The foregoing exemption shall include specifically exemption from:

(i) all property and franchise taxes;
(ii) all annual or specific license fees (except automobile license fees);
(iii) all import duties and other taxes, including trade taxes and excise taxes, on building materials, furnishings and equipment used in the construction, operation, maintenance and expansion of the Plant and Related Facilities, and on raw material brought into the Virgin Islands

500

Harvey to obtain reimbursement of no more than $3,000,000 of Harvey's cost, in developing the deep-water channel and its turnabout area from certain so-called matching funds payable by the United States to Government with the pro-

for consumption or processing at the Plant and Related Facilities;

(iv) all excise and gross receipts taxes in respect of exports or sales of products or hire or use of property.

\*     \*     \*     \*     \*     \*     \*

"Contractors and subcontractors for Harvey and its Affiliates shall be exempt from the payment of all excise taxes on building materials, furnishings and equipment imported into the Virgin Islands by such contractors and subcontractors for use in the construction and expansion of the Plant and Related Facilities during the period to which the foregoing exemption applies; provided, however, that the exemption provided for in this sentence shall not be applicable to construction equipment of such contractors and subcontractors.

"(B) Harvey and such of its Affiliates as are engaged in the business of constructing, owning and/or operating, in whole or in part, the Plant and Related Facilities shall, except to the extent that Federal statute may otherwise provide, receive a non-taxable subsidy measured by the following taxes, except to the extent that Harvey and its Affiliates are exempted from such taxes pursuant to the terms of this Agreement, in an amount equal to

(i) seventy-five percent (75%) of the income taxes in respect of a period of sixteen (16) years from the date of completion of construction of the Plant (other than in respect of income derived from sources within any of the States of the United States) actually paid into the Treasury of the Virgin Islands; and

(ii) one hundred percent (100%) of the import duties and other taxes on raw materials brought into the Virgin Islands for consumption or processing at the Plant and Related Facilities, and on building materials, furnishings and equipment imported into the Virgin Islands for use in the construction and expansion of the Plant and Related Facilities, actually paid into the Treasury of the Virgin Islands in respect of a period of sixteen (16) years from the Approval Date; and

(iii) the entire amount of any taxes actually paid into the Treasury of the Virgin Islands that are attributable to or are imposed, directly or indirectly as a result of one or more of (1) the subsidy and other payments, conveyances of property, and/or other actions by the Government in compliance with this Section (including this subdivision (iii) hereof) or any of the other provisions of this Agreement, (2) any sale, conveyance, exchange or transfer at any time within the period of sixteen (16) years from the Approval Date of all or any portion of, or interest in, the Government Properties and/or properties then comprising the Site, between Harvey, its Affiliates, or any two or more of them, of (3) any sale, conveyance, exchange or transfer at any time within the period of sixteen (16) years from the Approval Date of all or any portion of, or interest in, the Government Properties and/or properties then comprising the Site, by Harvey, its Affiliates or any of them to or with one or more other persons, firms or corporations for the purpose of acquiring real property (or interests pertaining thereto) in the Virgin Islands to be included in the Site or for the purpose of acquiring cash or property which, within three years of such acquisition, is unused for said purpose.

"During the period of sixteen (16) years from the date of completion of construction of the Plant, any stockholders of any such corporations who are residents of the Virgin Islands shall receive a non-taxable subsidy in an amount equal to seventy-five percent (75%) of the income taxes

viso that if allocations from the matching funds proved insufficient that Harvey could secure reimbursement from Government's "unobligated non-tax revenues", and if the latter were insufficient, Harvey could "offset" unpaid balances against its obligation to pay Government taxes other than income taxes;[7] and (4) to maintain the channel and

actually paid by them into the Treasury of the Virgin Islands on income derived by them as stockholders from activities in respect of the Plant and Related Facilities to which the foregoing exemptions and subsidies relate.

\*   \*   \*   \*   \*   \*   \*

". . . All transfers of real property (or interests pertaining thereto) to and from the Government pursuant to the terms of this Agreement, transfers of real property (or interests pertaining thereto) by and between Harvey and any one or more of its Affiliates, or by and between any two or more such Affiliates, and any transfers of real property (or interests pertaining thereto) contemplated by subdivision 9(B)(iii) and any other provision of this Agreement, shall be exempt from all taxation by the Government."

In Paragraph 4 of Annex C to the Agreement there were these further tax exemptions and subsidy provisions:

"(A) Harvey and its Affiliates shall have the right to use the above-mentioned channel and turnabout area free of any taxes, excises, duties, fees, charges, imposts or exactions imposed by or with the consent of the Government or any subdivision, agency or instrumentality thereof, for a period of sixteen (16) years from the date of first commercial use thereof, which shall be deemed for purposes hereof to be the first anniversary of the Commencement Date; provided that Harvey and its Affiliates shall not thereafter be subject to any such taxes, excises, duties, fees, charges, imposts or exactions except as a part of a general law applicable to the use of navigational facilities subject to the jurisdiction of the Government."

[7] The provisions as to reimbursement appear in Paragraph 4 of Annex C:

"(A) Subject to the terms and conditions set forth herein, the Government agrees to reimburse Harvey for the costs of the Channel Project, directly or indirectly incurred by Harvey on behalf of the Government for the dredging and completion of the channel and turnabout area, including in the computation of such costs a reasonable allocation of overhead and other indirect costs, all as determined in accordance with good accounting practices. The Government's undertaking herein to make reimbursement to Harvey as aforesaid shall in no event be considered to be a general obligation of the Government and shall not bear interest. Such reimbursement to Harvey shall not exceed $3,000,000 in the aggregate if either the Channel Project was constructed according to the design submitted by Harvey or Harvey failed to submit a design within eighteen (18) months after the Approval Date.

"(B) Within thirty (30) days after the end of Harvey's fiscal year, Harvey's Chief Financial Officer shall certify in reasonable detail to the Government the aggregate amount reimbursable but unreimbursed to Harvey hereunder, as at the end of such fiscal year, in respect of Channel Project costs incurred in that and any preceding fiscal year, and within thirty (30) days after the commencement of the Government's next succeeding fiscal year, the Government shall reimburse to Harvey the lesser of such amount and $500,000.

"(C) The Government agrees to use its best efforts to obligate, to the extent that it may lawfully do so, for the purpose of making and to the

502

its turnabout area free from obstructions and dredged to their completed dimensions.

The Agreement prefaced its covenanting provisions with this statement of policy:

"WHEREAS, it is the policy of the Government to alleviate under-employment in the Virgin Islands, to improve the quality of employment through the offering of employment involving higher skills, to have established in the Virgin Islands self-sustaining business enterprises and to encourage the investment of capital in the Virgin Islands, all to the end that the economy of the Virgin Islands may rest on a broader base; and

"WHEREAS, Harvey and Harvey Aluminum desire to acquire and operate processing and other facilities for the production of alumina and related products in the Caribbean area which Harvey anticipates will require the expenditure of $25,000,000, more or less, and (as reflected in the project information previously submitted by Harvey to the Government and referred to below) provide employment to approximately 400 persons; and

"WHEREAS, Harvey and Harvey Aluminum are willing to locate such facilities in the Virgin Islands, but only at the request and with the authorization of the Government and in accordance with other terms and provisions, all as set forth below; and

"WHEREAS, the Government considers that such facilities, if established, would promote the public interest by assisting in the economic development of the Virgin Islands; and

extent necessary to make the reimbursement referred to above, all monies transferred and to be transferred to the Government pursuant to Section 7652 of the United States Internal Revenue Code of 1954, as amended, and the separate fund in which such monies are to be deposited pursuant to said Section. If and to the extent such monies and fund be insufficient for such purpose in any fiscal year, the Government undertakes, to the extent that it may lawfully do so, to obligate for the purpose of making and to the extent necessary to make such reimbursement, all other unobligated non-tax revenues of the Government. If and to the extent that said monies, fund and revenues be insufficent for such purpose in any fiscal year, the Government agrees that for the purpose of making and to the extent necessary to make such reimbursement (i) Harvey and its Affiliates may offset any amount reimbursable to Harvey then remaining unreimbursed against any amount other than income taxes that Harvey and its Affiliates may then have the obligation to pay over to the Government or its designee or designees, and (ii) the subsidy payable to Harvey and its Affiliates in respect of that and succeeding taxable years pursuant to Section 9 (B) (i) of the foregoing Agreement shall be increased from seventy-five percent (75%) to one hundred percent (100%) of the income taxes (other than in respect of income derived from sources within any of the States of the United States) actually paid into the Treasury of the Virgin Islands."

"WHEREAS, the Government after due investigation and consideration has determined that the construction and operation of such facilities would not be prejudicial to the health or welfare of the inhabitants of the Virgin Islands or to local property owners; and "WHEREAS, as an inducement to Harvey and Harvey Aluminum to locate such facilities in the Virgin Islands, the Government is prepared to provide certain properties and a deep-water access channel in the vicinity of the Krause Lagoon area of St. Croix where it is presently contemplated that such facilities will be located, to grant certain tax exemptions and subsidies, and to comply with the other terms and provisions set forth below in order to authorize, facilitate and promote the establishment and operation of such facilities in the Virgin Islands;

"NOW, THEREFORE, the parties hereto mutually covenant and agree as follows:"

The Act 814 which adopted and ratified the Agreement and authorized the Governor of the Virgin Islands to carry out its provisions, it was stated:

"AN ACT To Ratify and Adopt a Certain Agreement of February 8, 1962, Relating to an Alumina Plant Development in the Island of St. Croix and for Other Purposes.

*"Be it enacted by the Legislature of the Virgin Islands:*

"Section 1. The Legislature of the Virgin Islands hereby finds and declares:

"(1) that it is essential to the stability of the Virgin Islands economy that dependence on tourism be relieved through the establishment of industrial operations capable of providing and sustaining large scale employment and of contributing significantly toward a wider base for insular economic well-being;

"(2) that there is an existing and urgent necessity for the creation of additional water and power facilities as contemplated by the agreement referred to in the following paragraph the surpluses of which could be made available for the use of the inhabitants of St. Croix, and of business, industry and government;

"(3) that the development of an alumina plant and its related facilities as provided for in a certain agreement entered into on February 8, 1962, between the Government of the Virgin Islands and Harvey Alumina Virgin Islands, Inc., will promote the public interest by economic development of the Virgin Islands, and is

504

vital to the prosperity of the entire region;

"(4) that the construction and development by the Government of the Virgin Islands of an access channel, and of public pier, docking and warehousing facilities (which construction and development are hereby authorized) are essential public projects which will promote the public interest by economic development of the Virgin Islands; and

"(5) that the extraordinary advantages and benefits to the people of the Virgin Islands, to be directly derived from the undertakings proposed, fully warrant and require the cooperation, encouragement and assistance of the Government."

In their petitions seeking a decree declaring the Agreement and Act 814 invalid the appellants alleged that there was "neither public need nor purpose" for conveying public lands to Harvey "without consideration", or reimbursing it for $3,000,000 of its cost in developing the deep water channel and its turnabout area or granting it tax exemptions and subsidies; further, that as taxpayers, appellants had "a substantial pecuniary interest" with respect to the public lands and reimbursement undertaking, tax exemptions and subsidies, and accordingly had standing to bring their actions.[8]

[8] As the appellants put it in their briefs "the Smith suit challenged the right of the Government to expend public moneys to reimburse Harvey the cost of constructing and dredging a channel and turning basin to provide access to its plant and in maintaining the channel", and "the Neumann suit challenges the Government's right to give 1200 acres of public land to Harvey as an inducement to install and operate an alumina plant on St. Croix." Smith, in his petition averred that he has "a substantial pecuniary interest in any sums, revenues and funds of federal and territorial public monies that may unlawfully be obligated and expended by the Government of the Virgin Islands;" further, that "the obligations undertaken by Respondent [Government] for the expenditure of $3,000,000 or more of federal matching funds on a Channel Project which was primarily for the benefit of a private concern and for which there was neither public need nor purpose," as well as Government's granting to Harvey of tax exemptions and industrial subsidies "amounts to a deprivation of property of the taxpayers of the Virgin Islands without due process of law and an infringement of the protections provided to the taxpayers and citizens of the Virgin Islands in the Revised Organic Act of the Virgin Islands." Neumann in his petition made similar averments as to his "substantial pecuniary interest in the conservation and proper disposal of all assets of the Government of the Virgin Islands," and alleged "that the conveyance of public lands" to Harvey as provided by the Agreement and Act 814 "is not for a public purpose but instead is designed to render special financial assistance to a privately owned corporation . . . without adequate consideration."

Government and Harvey each filed a "Motion to Dismiss and For Summary Judgment" with respect to the appellants' separate petitions, premising the request for dismissal "on the ground of failure to state a claim upon which relief can be granted", and that for summary judgment on the ground "that there is no genuine issue as to any material fact" and that the movant "is entitled to judgment as a matter of law."

On the score of the alleged "failure to state a claim upon which relief can be granted" the motions to dismiss stated:

"1. (c) As appears from the petition, the Act and the Agreement *and the affidavits attached as Exhibits 1-8,* no tax funds to which Petitioners contributed were used to purchase said lands or will be used to effect any of the other matters complained of. (Emphasis supplied.)

"(d) Petitioners cannot show that their taxes will be increased as a direct and immediate consequence of any of the matters complained of.

"(e) Petitioners, thus, have no interest as taxpayers which will allow them to maintain this suit, and accordingly, there is no justiciable controversy and the petition fails to state a claim upon which relief can be granted."

The District Court in a brief Order granted the motions to dismiss the petitions under Rule 12(b) (6) F.R.C.P. for "failure to state a claim upon which relief can be granted." It did not rule with respect to the summary judgment phase of the motions.

While the District Court did not in its Order state the reason or reasons for its determination that the petitions failed "to state a claim upon which relief can be granted", implicit in its references to cases cited in that Order is its conclusion — not stated in terms — that the appellants had failed to allege that they had sustained, or were in immediate danger of sustaining, some direct injury as the result of the carrying out of the Agreement, or that they had a real interest beyond a desire to see that the laws of the Virgin Islands are enforced.

506

The parties to these appeals have seen fit to expend their talented energies and indefatigable efforts in presenting their respective arguments with respect to what may be designated as the "substantive" merits of the controversy as to whether the District Court erred in dismissing the petitions for failure to state a claim upon which relief can be granted.

■ The arguments are academic to the issue presented by these appeals as to whether the District Court erred in dismissing the petitions in view of the fact that it was procedurally precluded from doing so under the clear and dispositive provisions of Rule 12(b) and (c) of the Rules. Rule 12(b) states:

". . . If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, *matters outside of the pleadings are presented to and not excluded by the Court,* the motion *shall* be treated as one for summary judgment and disposed of as provided in Rule 56. . . ." (Emphasis supplied.)

Rule 12(c) states:

"(c) Motion for Judgment on the Pleadings. After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion *shall* be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." (Emphasis supplied.)

In the instant cases the Motions to Dismiss in paragraph 1(C) earlier set forth, were premised on what appeared "in the petitions, the Act and the Agreement *and the affidavits attached as Exhibits 1–8*", which had been "presented to and not excluded by the Court", and according to the mandate of Rule 12(b) and (c), the District Court could not dismiss the petitions but was compelled to proceed under Rule 56, the summary judgment rule. Romero v. Inter-

national Terminal Operating Co., 358 U.S. 354, 357 n.4 (1959); Gager v. "Bob Seidel", 300 F.2d 727, 731 (C.A.D.C. 1962), cert. den. 370 U.S. 959; Ellis v. Carter, 291 F.2d 270, 275 (9 Cir. 1961).

Since the record made below fairly presents the issue as to whether Government and Harvey are entitled to summary judgments judicial economy will patently be served by an immediate determination of this issue rather than remanding these cases to the District Court for disposition. Romero v. International Terminal Operating Co., supra.

As earlier stated, the appellants premised their petitions seeking a decree declaring the Agreement and Act 814 invalid on the grounds that it lacked "adequate" consideration and there was "neither public need nor purpose" (1) for the Government's conveyance of public lands to Harvey as site for its alumina plant and deep-water channel project; (2) reimbursement by Government of $3,000,000 of Harvey's cost in developing the channel; and (3) the Government's granting of tax exemptions and subsidies to Harvey.

While neither Government nor Harvey asserted in terms in their individual motions to dismiss and for summary judgment that the Agreement and Act 814 were designed to effectuate the public purpose they, however, filed in support of their motions an affidavit of Lawrence A. Harvey, president of Harvey, certifying that the alumina project would entail an expenditure of $25,000,000; that construction had been commenced; and that $1,000,000 had been expended "on the design and construction of the alumina plant"; and additional affidavits that Harvey had supplied to Government the $6,100 to acquire the Krause Lagoon acreage; that prior to such acquisition Government had not levied any taxes against the Krause Lagoon acreage since 1936; that the revenues derived by Government from

508

Airport Land "at no time has been more than $1,760.00 per year"; and that Harvey had covenanted to pay into the Airport Fund of the Virgin Islands $2,500.00 for a period of sixteen years commencing December 31, 1962 in consideration of the conveyance to it of Airport Land.

Government and Harvey also filed as an Exhibit an "Address of Governor Ralph M. Paiewonsky [of the Virgin Islands], made a part of the Legislative record of the subject Act No. 814 . . . ." in which he stated that salt water conversion and power plants to be constructed and operated by Harvey in connection with its project would make available for public consumption surpluses of water and power, and that the alumina development would "upgrade" the economy of the Virgin Islands. Further, at a hearing held by the District Court on the dismissal and summary judgment motions both Government and Harvey cited in support of the public purpose design of the Agreement and Act the declarations of such purpose contained therein, and the finding of the Legislature, expressed in the Act, that the Harvey development would make available "public pier, docking and warehousing facilities" which "will promote the public interest by economic development of the Virgin Islands."

Prior to the hearing on the dismissal and summary judgment motions the appellants filed affidavits expressing "expert" opinions that (1) 100 to 300 acres would be ample to provide a site for the alumina plant and that 1200 acres "was excessive"; (2) there was no condition of unemployment in St. Croix; (3) Krause Lagoon had a great value to the Virgin Islands as a wildlife refuge, breeding ground and area for game fishing; and (4) the 500-acre Krause Lagoon (for which $6,100 had been paid) had an appraised value of from $125,000 to $350,000, and the 700-acre Airport Land an appraised value of from $625,000 to $969,250.

It must immediately be noted on the score of these ap-

praisals that appellants have not adverted to them here, either in the several briefs which they have filed or at oral argument, and have merely stated without specification, in their petitions and briefs, that there was not "adequate consideration" for the conveyance of the public lands.

Again, as earlier stated, the appellants have premised their petitions on their view that "there was neither public need nor purpose" for conveying public land to Harvey, granting it tax exemptions and subsidies and reimbursement of $3,000,000 of its cost in developing the deep-water channel and turnabout area and that accordingly, Act 814 and the Agreement which it adopted and ratified were invalid.

Appellants do not dispute that if there was "public need or purpose" in the enactment of Act 814, and the Agreement and its undertakings, they have not made out a case. They vigorously contend, however, that the record affirmatively establishes absence of "public need or purpose", and alternatively, it at least presents genuine issues as to material facts with respect to the existence of "public need or purpose" which preclude entry of summary judgment against them.

Applicable to these contentions are these well-settled principles:

"Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation"; ". . . courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws"; and "Legislative bodies have broad scope to experiment with economic problems".[9] *They may "legislate so as to increase the industries of the State, develop its resources and add to its wealth and prosperity."*[10] (Emphasis supplied.)

[9] Ferguson v. Skrupa, 372 U.S. 726, 729, 730 (1963).
[10] Barbier v. Connolly, 113 U.S. 27, 31 (1885).

510

■■ "Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive"; further, "The role of the judiciary" in determining whether the legislative power is being exercised for a public purpose "is an extremely narrow one" and once the public purpose has been established the means of its effectuation are for the legislative body — and it alone — to determine.[11]

■ Courts "do not sit as a super-legislature to weigh the wisdom of legislation", and they *"leave debatable issues as respects business, economic and social affairs to legislative decision."*[12] (Emphasis supplied.)

■ "The public welfare is a broad and inclusive concept. The moral, social, *economic, and physical well-being of the community* is one part of it; the political well-being, another.[13] (Emphasis supplied.)

■ "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it."[14]

■ Whether legislation serves a public purpose "is a practical question addressed to the law-making department, and it would require a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court."[15]

■■ Applying the principles stated we are of the opinion that the legislative record provides a rational basis

[11] Berman v. Parker, 348 U.S. 26, 32, 33 (1954).
[12] Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 423, 425 (1952).
[13] Id. at 424, 425.
[14] Nebbia v. New York, 291 U.S. 502, 537 (1934).
[15] Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 515 (1937).

for the enactment of Act 814 and that it would constitute judicial trespass on the legislative function to proceed further with this litigation.

■ Courts may not serve as a forum for the debate of legislative decisions though they may be fairly debatable. It is settled law that a rational actual basis for particular legislation must be held to exist if the question of what the facts establish is a fairly debatable one. *Clark v. Paul Gray, Inc.,* 306 U.S. 583, 594 (1939); *United States v. Carolene Products Co.,* 304 U.S. 144, 154 (1938).

The appellants contend that the critical issue as to whether the Act, the Agreement and its undertakings, are invalid, depends on resolution of what they term to be "genuine issues with respect to material facts", to wit: (1) were the land grants to Harvey for a public purpose and had it "been given large tracts of land exceeding its needs"; (2) were the tax exemptions and subsidies accorded Harvey, and reimbursement to it of $3,000,000 of its cost in developing the deep-water channel, justifiable as effectuating the public purpose; (3) was the deep-water channel "an essential public project"; and (4) had the Legislature "had adequate time to study the Agreement and to investigate its many ramifications?"

It is immediately apparent that what the appellants identify as "genuine issues as to material facts" are nothing more and nothing less than the assertion of debatable issues concerning which they entertain one view and the Legislature another, and as to which the Legislature has the last word. As we said in *United States v. Kissinger,* 250 F.2d 940, 942 (1958):

"They [courts] do not have power to inquire into either the degree of the necessity for . . . legislation or its wisdom or effectiveness."

It may be observed, parenthetically, on the score of the appellants' debatable issue as to whether the Legislature "had adequate time to study the Agreement and to

512

investigate its many ramifications" that some six months before the Legislature enacted Act 814 on February 19, 1962, it authorized a special independent industrial development committee to study alumina plants on the Island of Jamaica, where they are a major industry; that on February 14, 1962, the Legislature, sitting as "A Committee of the Whole", held a well-attended public hearing on the proposed Act and Agreement at St. Croix at which its proponents and opponents, including among the latter, counsel for the appellants, vigorously expressed their views.

It might be said anent our earlier statement that the legislative record presents a rational basis for its enactment of Act 814 that we had in mind its specific findings and declarations that the $25,000,000 alumina plant and its related facilities, as well as the deep-water channel and supplementary public piers, docks and warehousing facilities would relieve the Virgin Islands of dependence on tourism; promote employment; "promote the public interest by economic development of the Virgin Islands"; and provide water and power facilities whose surplus would be available for public use; further, "that the extraordinary advantages and benefits to the people of the Virgin Islands, to be directly derived from the undertakings proposed, *fully warrant and require the cooperation, encouragement and assistance of the Government*". (Emphasis supplied.)

It may be noted in passing that the United States, acting through the Administrator of the Federal Aviation Agency, approved the conveyance of Government's restricted title to Airport Land to Harvey, after it considered the provisions of the Agreement; further, that the "Deed of Release" from the United States to the Virgin Islands, dated May 16, 1962, specifically noted that such Release was to enable Government to convey the land to Harvey as site for its alumina plant.

For the reasons stated the Order of the District

Court dismissing the appellants' petitions will be vacated and the causes remanded with directions to the District Court to enter summary judgments against the appellants.