Jerry R. ENGLAND et al., Appellants,

v.

LOUISIANA STATE BOARD OF MEDICAL EXAMINERS et al., Appellees.

No. 16920.

United States Court of Appeals
Fifth Circuit.
Jan. 23, 1959.

Jack L. Simms, Leesville, La., Floyd J. Reed, New Orleans, La., J. Minos Simon, Lafayette, La., for appellants.

St. Clair Adams, Jr., New Orleans, La., for appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges.

PER CURIAM.

Appellees' petition for rehearing evidences such complete misunderstanding of the scope and effect of this Court's opinion and decision, that some further elucidation is indicated, particularly in view of the public importance of this litigation. That can best be done in our opinion, by briefly answering the first four grounds of the petition for rehearing.

> "1. The Court, in its opinion of reversal remanding this case for trial, has failed to take into consideration the fact that neither a State nor a Federal Court can supersede the authority of the State Legislature, particularly where the health and welfare of the people of the State are at issue."

It is as elementary as it is fundamental that no court can supersede the authority of the state legislature. Certainly, this Court did not and would not attempt to do so. Our opinion clearly stated that: " * * * the question is whether they (chiropractors) are entitled to an opportunity to prove that the State's denial of their claimed right to practice an allegedly useful profession is so arbitrary and unreasonable as to

amount to a denial of due process or of the equal protection of the laws under the Fourteenth Amendment." The extent of our holding was thus expressed: "We hold simply that the plaintiffs are entitled to a day in court, to an opportunity to prove their case."

■ No court, state or federal, has held that a state legislature has *unlimited* power or authority even with respect to such subjects as the health and welfare of the people of the state. The primary responsibility rests with the state legislature, but the courts have a solemn and inescapable duty, in an appropriate case, of deciding whether state action is so arbitrary and unreasonable as to be unconstitutional. That salutary check on the power and authority of a state legislature is recognized in every one of the cases relied on by the petitioners, as will appear from brief quotations in the margin.[1]

1. "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition. This right may in many respects be considered as a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or as it is sometimes termed, the 'estate,' acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken. But there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the state for the protection of society. The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud. As one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely; their possession being generally ascertained upon an examination of parties by competent persons, or inferred from a certificate to them in the form of a diploma or license from an institution established for instruction on the subjects, scientific and otherwise, with which such pursuits have to deal. The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession, or are attainable by such reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation." Dent v. State of West Virginia, 1889, 129 U.S. 114, 121, 122, 9 S.Ct. 231, 233, 32 L.Ed. 623.

"What authority the statute purports to confer upon the board is a question of construction. If it purported to confer arbitrary discretion to withhold a license, or to impose conditions which have no relation to the applicant's qualifications to practice dentistry, the statute would, of course, violate the due process clause of the Fourteenth Amendment." Douglas v. Noble, 1923, 261 U.S. 165, 168, 43 S.Ct. 303, 305.

" * * * And the case is to be considered in the light of the principle that the State is primarily the judge of regulations required in the interest of public safety and welfare, and its police statutes may only be declared unconstitutional where they are arbitrary or unreasonable attempts to exercise the authority vested in it in the public interest." Graves v. State of Minnesota, 1926, 272 U.S. 425, 428, 47 S.Ct. 122, 123.

" * * * And, although a state cannot prohibit the practice of medicine and surgery, and would hardly undertake to do such a thing, still it is well established that, under its police power, it may regulate, within reasonable bounds, for the protection of the public health, the practice of either, by defining the qualifications which one must possess before being admitted to practice the same, and, to make these regulations effective, to require the one intending to engage in the practice, to possess, before engaging therein, a certificate from the proper authority showing that he possesses the required qualifications * * *. The Legislature, however, in defining these requirements, cannot prescribe, as a con-

"2. The majority opinion of the Court in its Per Curiam decision does not consider or give effect to prior decisions of the Supreme Court of the United States. In particular, we refer to the following decisions:

"Louisiana State Board of Medical Examiners v. Fife, 162 La. 681, 111 So. 58, 54 A.L.R. 594, 274 U.S. 720, 47 S.Ct. 590, 71 L.Ed. 1324; Graves v. Minnesota, 272 U.S. 425, 47 S.Ct. 122, 71 L.Ed. 331; Douglas v. Noble, 261 U.S. 165, 43 S.Ct. 303, 67 L.Ed. 590; Dent v. State of West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L. Ed. 623."

The last three cases are those cited by the Supreme Court of the United States as authority for its per curiam affirmance in the first case. In footnote 1, supra, we have quoted from each of the cases, and each, of course, had our careful consideration. It is important to note that every one of those cases was decided upon the *evidence* and not merely upon the *pleadings* as was this case. Further, it is not clear that in the case closest in point, Louisiana State Board of Medical Examiners v. Fife, supra, there was actually and fully litigated and tried the issue of whether practitioners of chiropractic were engaged in the practice of a useful profession or calling which they had a lawful right to pursue unimpeded by requirements having no relation to such calling or profession. The decision in that case operates as res judicata only as to those who were parties, and does not deprive the present appellants of their day in court.

"3. The Court recognized that the State has the right to regulate the practice of medicine, and can bar such cults as witch doctors, voodoo queens, bee-stingers, and others, but apparently did not realize that any order that might be issued by this or the District Court compelling the Louisiana State Board of Medical Examiners to issue a medical license to chiropractors would at the same time have the effect of permitting anybody to practice medicine. It may be facetious, but if such an order were ever issued, even the writer of this Petition would have the right to apply to the Louisiana State Board of Medical Examiners, and they would have to issue him a medical license."

The Louisiana State Board of Medical Examiners certainly cannot be required to issue to a chiropractor a license to practice medicine unless he complies with all of the statutory prerequisites, including the passing of an examination before the Board upon the subjects of surgery and materia medica,[2] which the appellants claim bear no reasonable relation to the practice of chiropractic. That, however, is not the question at issue. The Louisiana State Board of Medical Examiners has more extensive powers than those of simply examining and licensing applicants for the practice of medicine. It has broad and preferential powers to conduct legal proceedings for the prevention of the unauthorized practice of medicine,[3] as that practice is broadly defined by the Louisiana Statute.[4] Those powers, the complaint alleges, are being used in such a manner as to deprive the plaintiffs of their claimed right to practice chiroprac-

---

dition to the right to practice, knowledge of a subject which bears no relation to the practice of medicine * * *.

" * * * If the Legislature were called upon to recognize every school of medicine, and to deal with it as such, requiring nothing but what the system practiced by each school demands, there might be some force to defendants' contention, but as we have held, the Legisture is not called upon to do so, but has a reasonable discretion as to whether a particular school should be recognized and special provision made for it * *." Louisiana State Board of Medical Examiners v. Fife, 1926, 162 La. 681, 111 So. 58, 60, 61.

2. LSA–R.S. 37:1271(5).

3. LSA–R.S. 37:1286.

4. LSA–R.S. 37:1261.

tic in Louisiana.[5] As we understand, the plaintiffs can claim no right to practice medicine as that practice is engaged in by medical doctors and surgeons. The question is whether they can be constitutionally excluded from the practice of chiropractic in Louisiana.

"4. *The majority opinion of the Court has completely overlooked the fact that the Medical Practice Act of Louisiana does not prohibit the practice of chiropractic but merely defines what constitutes the practice of medicine and directs the State Board to issue licenses to practice medicine only to those qualified as defined in the Statute. If a man is qualified to and takes the required examination under the Medical Practice Act, he can practice chiropractic, or for that matter, any of the other cults that have developed on the fringe of true medicine.*"

██ The answer is that the mere form of the statutes of a state cannot justify or excuse the deprivation of one's rights under the Constitution of the United States. The "practice of medicine" is defined broadly enough [6] to apply to dentists, nurses, and pharmacists. Each of those three professions is protected by a special statute, but if it were not, would any one deny the jurisdiction of a federal district court to protect a dentist, a nurse, or a pharmacist in the practice of his or her useful profession or calling? We reiterate our holding that the plaintiffs are entitled to an opportunity to attempt to prove that chiropractic is such a useful profession or calling that they cannot be constitutionally excluded from its practice in Louisiana in the manner and form claimed to be attempted by the State Legislature and by the State Board of Medical Examiners. Nothing said in our original opinion should operate to limit the evidence to the period since the decision in Louisiana State Board of Medical Examiners v. Fife, supra.

The foregoing was all that we had *originally written in denying the petition for rehearing.* Our dissenting brother, whose opinion we value highly,

5. "Plaintiffs aver that the Louisiana State Board of Medical Examiners has heretofore, does and threatens to continue to invoke the provisions of the Statute complained of herein as a means of enjoining plaintiffs from exercising their rights and privileges as citzens of the United States and for purposes of imposing fines and penalties on plaintiffs and all chiropractors in the State of Louisiana and by their efforts have caused to be established in the State of Louisiana by the Courts of Louisiana, a rule of law subjecting plaintiffs and all chiropractors to the provisions of the Statute complained of herein; that the alleged basis used to obtain the injunctions and impose fines and forfeitures or your plaintiffs herein and all chiropractors, is that plaintiffs and all chiropractors in Louisiana do not possess a certificate from the Louisiana State Board of Medical Examiners * * *."

"Plaintiffs allege that the defendants, Rhett McMahon and Edwin H. Lawson, while acting in their respective official capacities as set forth more fully herein before, and the members of the defendant Board, and the agents, attorneys, employees and servants of said State Board have drafted resolutions authorizing the prosecution in the State Courts of Louisiana of some or all of the plaintiffs herein, have actually prosecuted in the State Courts of Louisiana some of plaintiffs herein, and have thereby sought to obtain and intend to obtain injunctions, fines and forfeitures against plaintiffs herein and thereby intend to prohibit under penalty of imprisonment the plaintiffs herein from practicing their professional skills, all in purported reliance on said Act complained of herein and only because plaintiffs are chiropractors; that plaintiffs are now and threaten to continue to be greatly harmed, damaged, imprisoned and injured by the illegal, wrongful, knowing and purposeful acts of the defendants, and each of them, and they have no plain, adequate or efficient remedy at law to redress the wrongful, knowing and purposeful acts of the defendants other than this action for Declaratory Judgment and Injunctive relief; that any other remedy to which they could be remitted would be attended by uncertainties, would involve a multiplicity of suits and would cause plaintiffs irreparable harm and injury and occasion undue hardship, vexation and delay."

6. See Footnote 4, supra.

remained unconvinced, and further expressed his views so cogently and vigorously that we have been led to make a careful re-examination of our own views. They remain the same, but, to make certain that we do not continue to be misunderstood, we shall attempt still further to elucidate those views at coinsiderable length.

It was in 1888, before the Supreme Court had the opportunity to consider the full impact of the Fourteenth Amendment upon the rights of the States (couched in terms, "Police Power") to regulate the practice of medicine and the related healing arts,[7] that the case of Dent v. State of West Virginia, 1888, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623, was decided. The Court upheld a state regulation which made it mandatory for persons who practiced medicine, surgery, or obstetrics either to have graduated from a reputable medical college or to have practiced medicine for ten continuous years preceding the enactment. The Court stated that every citizen of the United States has a right to follow any lawful calling, business, or profession, "subject only to such restrictions as are imposed upon all persons of like age, sex, and condition * * * and [this right]. cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken." (129 U.S. at pages 121, 122, 9 S.Ct. at page 233.) On the other side of the balance, however, is the right of the state to regulate to protect the health and general welfare of its people. Concerning this police power, the Court stated the following language which has served as the basis for practically every decision concerning state regulation over the medical field:

"* * * But there is no arbitrary deprivation of such right. where its exercise is not permitted because of a failure to comply with conditions imposed by the state for the protection of society. The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud. As one means to this. end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely; their possession being generally ascertained upon an examination of parties by competent persons, or inferred from a certificate to them in the form of a diploma or license from an institution established for instruction on the subjects, scientific and otherwise, with which such pursuits have to deal. The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. *It is only when they have no relation to such calling or profession, or are unattainable by such. reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation.*" (Emphasis supplied.) 129

---

7. Before 1888 the Supreme Court had interpreted the effect of the Fourteenth Amendment upon various state laws which regulated alleged property and liberty guarantees on the basis of public health and welfare. These cases developed the well-known early policy of judicial restraint in economic due process. E. g., Munn v. Illinois, 1876, 94 U.S.

113, 24 L.Ed. 77; Barbier v. Connolly, 1885, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923; Yick Wo v. Hopkins, 1885, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Mugler v. State of Kansas, 1887, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205; Powell v. Commonwealth of Pennsylvania, 1887, 127 U.S. 678, 679, 8 S.Ct. 992, 1257, 32 L.Ed. 253.

U.S. at pages 121, 122, 9 S.Ct. at page 233.

■ Therefore, the Dent case established that only when the regulations "have no relation to such calling or profession" will they be struck down as arbitrary or unreasonable or capricious.

After the Dent case, several cases reiterated its holding that the courts would practice "judicial restraint" in reviewing the constitutionality of state laws concerning the regulation of public health and welfare.[8] With the Dent case thus strengthened, the case of Watson v. State of Maryland, 1910, 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 987, came before the Court. A *practicing physician* attempted unsuccessfully to have the Maryland Medical Practice Act Code 1904, art. 43, § 78 et seq. declared unconstitutional as arbitrary and containing unreasonable classifications and requirements which were similar to the present Louisiana Act.[9] He was admonished with the following strong language from the Court:

"It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health. There respect to a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, *has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law,* it is the duty of the courts to so adjudge, and thereby give effect to the Constitution. Mugler v. Kansas, 123 U.S. 623, 661, 8 S.Ct. 273; Minnesota v. Barber, 136 U.S. 313, 320, 10 S.Ct. 862; Atkin v. State of Kansas, 191 U.S. 207, 223, 24 S.Ct. 124, 48 L.Ed. 148." (Emphasis supplied.) (197 U.S. at page 31, 25 S.Ct. at page 363.)

However, Justice Harlan warned:

"* * * —that the police power of a state, whether exercised by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases as to justify the interference of the courts to prevent wrong and oppression. Extreme cases can be readily suggested." (197 U.S. at page 38, 25 S.Ct. at page 366.)

8. The Court upheld such various health and general welfare enactments as a statute expressly prohibiting barber shops to be considered a "work of necessity or charity" which would prevent them from doing business on Sunday (Petit v. State of Minnesota, 1899, 177 U.S. 164, 20 S. Ct. 666, 44 L.Ed. 716), a license tax of $100.00 for the sale of cigarettes (Gundling v. City of Chicago, 1900, 177 U.S. 183, 20 S.Ct. 633, 44 L.Ed. 725), and a statute preventing any felon from practicing medicine whether the conviction came before or after the enactment (Hawker v. People of State of New York, 1897, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002). However, the Court did hold an act regulating the slaughtering of animals and the inspection of meats unconstitutional as a burden on interstate commerce (State of Minnesota v. Barber, 1889, 136 U.S. 313, 10 S.Ct. 862, 34 L.Ed. 455).

In 1905 in the case of Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643, Justice Harlan, speaking for the Court in upholding the constitutionality of a compulsory vaccination law against attacks by healthy individuals, stated:

"Although this court has refrained from any attempt to define the limits of that power (police power), yet it has distinctly recognized the authority of a state to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other states. (197 U.S. at page 25, 25 S.Ct. at page 360.)

* * * * *

"If there is any such power in the judiciary to review legislative action in

9. In Watson v. State of Maryland, 1910, 218 U.S. 173, 30 S.Ct. 644, the Act required all physicians to stand an examination in various subjects unless they had been practicing for a required number of years or had treated so many people in the past year. The Act also provided for the requirements of good moral character and a diploma from certain medical colleges.

is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine. Dealing, as its followers do, with the lives and health of the people, and requiring for its successful practice general education and technical skill, as well as good character, it is obviously one of those vocations where the power of the state may be exerted to see that only properly qualified persons shall undertake its responsible and difficult duties." 218 U.S. at page 176, 30 S.Ct. at page 646.[10]

Only two years later in Collins v. State of Texas, 1912, 223 U.S. 288, 289, 32 S. Ct. 286, 288, 56 L.Ed. 439, the Court, through Mr. Justice Holmes, strengthened the Court's laissez-faire attitude of lack of interference with a State's regulation over the field of medicine. Collins was an osteopath who professed "to help certain ailments by scientific manipulation affecting the nerve centres." After a two-year course of study, he held a diploma from the American School of Osteopathy, Kirksville, Missouri. The Texas Medical Practice Act (Vernon's Ann. Civ.St. art. 4495 et seq.) was practically identical to the one in the present case. Its definition of "practicing medicine within the meaning of this act" was all inclusive. After providing for obtaining verification licenses for all existing medical practitioners, it provided that all new applicants must be graduates of "bona fide reputable medical schools," reputability to be met when the school's "entrance requirements and courses of instruction are as high as those adopted by the better class of medical schools

of the United States. * * *" The Act also required the applicant, after presenting such a diploma, to pass an examination on the subject of anatomy, physiology, chemistry, histology, pathology, bacteriology, physical diagnosis, surgery, obstetrics, gynecology, hygiene, and medical jurisprudence. The Act then specifically excluded from its operation dentists, nurses, masseurs, and surgeons of the Armed Forces.

Observing that Collins had not presented his osteopathy diploma to the Board of Medical Examiners and had not attempted to obtain a verification license, the Court held that his proof failed to show that the statute inflicted any constitutional wrong, especially since there was no showing that the required examination covered such subjects as therapeutics or materia medica which had no relation to osteopathy.

The Court further held that the plenary definition of practicing medicine in Section 13 of the Act was not arbitrary or irrational since its purpose was merely to define who should come within the terms of the Act, and "we should presume, until the Texas courts say otherwise, that the reference in § 4 to the diploma of a reputable and legal college of medicine, and the confining in § 7 of examinations to graduates of reputable medical schools, use the words 'medicine' and 'medical' with the same broad sense as § 13, and that the diploma of the plaintiff in error would not be rejected merely because it came from a school of osteopathy." 223 U.S. at page 296, 32 S.Ct. at page 228. After thus presuming that graduates of reputable schools of osteopathy would be eligible to take the

10. However, the above quote was qualified with this language:
"It was therein held [Williams v. State of Arkansas, 217 U.S. 79, 30 S.Ct. 493, 54 L.Ed. 673] that regulations of a particular trade or business essential to the public health and safety are within the legislative capacity of the state in the exercise of its police power, and that unless such regulations are so *unreasonable and extravagant* as to interfere with property and personal rights of citizens, unnecessarily and arbitrarily, they are within the power of the state; and that the classification of the subjects of such legislation, so long as such classification has a *reasonable basis*, and is not merely arbitrary selection without real difference between the subjects included and those omitted from the law, does not deny to the citizen the equal protection of the laws." (Emphasis supplied.) (218 U.S. at page 178, 30 S.Ct. at page 646).

examinations in the named subjects, the Court concludes that these examinations were not unreasonable or capricious or unrelated requirements to the practice of osteopathy and that the expressed exclusion of nurses, masseurs or dentists was not discriminatory.[11]

Therefore, this case, by dictum, raises an analogous issue to one raised in the case at bar, where the chiropractors contend that the defendant Board, by limiting applicants to graduates of American Medical Association approved schools, has arbitrarily prevented chiropractors from becoming eligible to take the required examination. In other words, that the requirement of a "diploma from a college in good standing, *of any sect* teaching medicine or the healing art" under Section 1271 must be construed (under a reasonable interpretation) in the "same broad sense" as Section 1261, "and that the diploma of the plaintiff in error would not be rejected merely because it came from a school of" chiropractic. Plaintiffs follow through by saying that the Palmer School of Chiropractic *is* a "college in good standing *of any sect* teaching medicine or the healing art."

In two cases heavily relied upon by the appellees, Douglas v. Noble, 1923, 261 U.S. 165, 43 S.Ct. 303, 67 L.Ed. 590, and Graves v. Minnesota, 1926, 272 U.S. 425, 47 S.Ct. 122, 71 L.Ed. 331, the Court expressed in strong language that the state legislature may, within the limitations of reasonableness and non-arbitrariness, exercise its police statutes so as to prescribe regulations, requirements, and qualifications, for *dentists practicing dentistry* within the State.[12] However

11. "In short, the statute says that if you want to do what it calls practising medicine, you must have gone to a reputable school in that kind of practice. Whatever may be the osteopathic dislike of medicines, neither the school nor the plaintiff in error suffers a constitutional wrong if his place of tuition is called a medical school by the act for the purpose of showing that it satisfies the statutory requirements. He cannot say that it would not have been regarded as doing so, because he has not tried. Dent v. West Virginia, 129 U.S. 114, 124, 9 S.Ct. 231, 32 L.Ed. 623.

"An osteopath professes, the plaintiff in error professes, as we understand it, to help certain ailments by scientific manipulation affecting the nerve centres. It is intelligible, therefore, that the State should require of him a scientific training. Dent v. West Virginia, 129 U.S. 114, 9 S.Ct. 231; Watson v. Maryland, 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 987. He, like others, must begin by a diagnosis. It is no answer to say that in many instances the diagnosis is easy,— that a man knows it when he has a cold or a toothache. For a general practice science is needed. An osteopath undertakes to be something more than a nurse or a masseur, and the difference rests precisely in a claim to greater science, which the state requires him to prove. The same considerations that justify including him justify excluding the lower grades from the law." Collins

v. Texas, 1912, 223 U.S. 296, 297, 32 S. Ct. 288.

12. In Douglas v. Noble, an act of the State of Washington, Code 1915, § 8412 et seq., which provided license requirements for dentists was under attack as being an arbitrary exercise of legislative power. After providing for good moral character and a diploma from a reputable dental college, the act allowed the dental board to determine "what the knowledge and skill is which fits one to practice the profession * * * [and determine by examination] whether the applicant possesses that knowledge and skill * *." 261 U.S. at page 169, 43 S.Ct. at page 305. The applicant met the first two requirements but flunked the dental board's examination. The Court summarily held that there was no arbitrary discretion to grant or withhold or revoke licenses.

In Graves v. Minnesota, the Minnesota Act (M.S.A. § 150.01 et seq.) required that every applicant for a dentist's license should produce before the Board of Dental Examiners "his diploma from some dental college of good standing" of which the Board shall be the judge. Dentist Graves did not have a diploma from such college, was refused a license, and was thus convicted under the Act. In holding that the diploma requirement from such college is not unreasonable, arbitrary, or discriminatory under the Fourteenth Amendment, the Court stated that "it is well settled that a state

strongly the appellees rely upon these two cases, we cannot see how they can be anything but authority for the general proposition that such a case

"＊ ＊ ＊ is to be considered in the light of the principle that the State is primarily the judge of regulations required in the interest of public safety and welfare, and its police statutes may only be declared unconstitutional where they are *arbitrary* or *unreasonable* attempts to exercise the authority vested in it in the public interest." (Italics supplied.) Graves v. Minnesota, 272 U.S. at page 428, 47 S.Ct. at page 123.

In line with Douglas v. Noble and Graves v. Minnesota, supra, the Court has held that a state, by insisting upon the personal obligations of the individual, may deny the right to practice dentistry to corporations, Miller v. State Board of Dental Examiners of State of Colorado, 1932, 287 U.S. 563, 53 S.Ct. 6, 77 L.Ed. 496, may prohibit dentists from advertising or having any kind of publicity, Semler v. Oregon State Board of Dental Examiners, 1935, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086, and may prohibit the selling of eyeglasses at any retail store without the personal attendance of a physician or optometrist, Ro-

schen v. Ward, 1929, 279 U.S. 337, 49 S.Ct. 336, 73 L.Ed. 722.

The case which the appellee-Board says is dispositive of the case at bar is Louisiana Board of Medical Examiners v. Fife, 1927, 162 La. 681, 111 So. 58, affirmed per curiam on the authority of Dent v. West Virginia, supra, Douglas v. Noble, supra, and Graves v. Minnesota, supra. The Fife case was based in large part upon two earlier decisions of the Louisiana state courts, Allopathic State Board of Medical Examiners v. Fowler, 1898, 50 La.Ann. 1358, 24 So. 809, and Louisiana State Board of Medical Examiners v. Cronk, 1924, 157 La. 321, 102 So. 415, discussed in the margin.[13]

The Fife case was an appeal from an enjoining of chiropractors from practicing medicine without a license. After reiterating that "practicing chiropractic" was under the definition of practicing medicine (as held in the Cronk case, supra), the Court answered the chiropractors' contentions that the requirements of the Act, having no reasonable relation to chiropractic, "virtually suppress" chiropractic in violation of constitutional rights[14] by stating, and we paraphrase from the opinion: Although a state cannot prohibit the practice of medicine, it may, under its police power, regulate it within reasonable bounds, by de-

may, consistently with the Fourteenth Amendment, prescribe that only persons possessing the reasonably, necessary qualifications of learning and skill shall practice medicine or dentistry."

13. In the Fowler case, [50 La.Ann. 1358, 24 So. 816] the members of the board of medical examiners were either of the allopathic or the homeopathic schools of medical science. The defendant had a diploma from an eclectic school of medicine, and, upon conviction of practicing medicine without a license, he defended on the grounds that the statute discriminated against the eclectic school. The court held that a person's constitutional rights did not bind the state to recognize and deal with each "special school of medicine under a selected name."

In the Cronk case, the court upheld a conviction of practicing medicine without a license, deciding that practicing chiropractic was within the definition of "Practice of Medicine, Surgery or Midwifery."

14. The court stated the issue:
"＊ ＊ ＊ Their contention is that to require them to stand an examination in surgery and materia medica, and perhaps in other things, is to require them to be qualified in subjects for which they and those who practice chiropractic have no need, and which bear no relation to that system, and, since the effect of these requirements is to virtually suppress the practice of chiropractic in this state, they plead that the statute deprives them of liberty and property without due process of law, in violation of the constitutions of this state and of the United States."
Louisiana Board of Medical Examiners v. Fife, 1927, 162 La. 681, 111 So. 58, 60.

fining the qualifications necessary to admission to practice and requiring a certificate from a proper authority showing that one possesses the above qualifications. As to the examination in such courses as materia medica and surgery (alleged to be immaterial to chiropractic), the legislature cannot require knowledge of a subject which bears no relation to the practice of medicine. But this does not mean that the state must make requirements for each particular school of medicine or each theory of the healing arts (Fowler case, supra). Likewise, the exclusion of others (as dentists and osteopaths) from the Act does not unconstitutionally discriminate against chiropractors because there is no constitutional right given to a particular group of people which requires a state to recognize them as a special school of medicine (Fowler case, supra). Therefore,

" * * * If the Legislature were called upon to recognize every school of medicine, and to deal with it as such, requiring nothing but what the system practiced by each school demands, there might be some force to defendants' contention, but as we have held, the Legislature is not called upon to do so, *but has a reasonable discretion* as to whether a particular school should be recognized and special provision made for it." (Italics supplied.) (111 So. at page 61.)

There have been three recent cases concerning state regulation in the field of the healing art which help fill the picture of the court's role as a reviewing authority in this area. These three cases are Williamson v. Lee Optical Company, 1955, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563, reversing, D.C., 120 F.Supp. 128;

Dantzler v. Callison, 1956, 230 S.C. 75, 94 S.E.2d 177, dismissed per curiam for want of a substantial federal question, 1956, 352 U.S. 939, 77 S.Ct. 263, 1 L.Ed. 2d 235; and Hitchcock v. Collenberg, D.C.1956, 140 F.Supp. 894, affirmed per curiam, 1957, 353 U.S. 919, 77 S.Ct. 679, 1 L.Ed.2d 718.

In Williamson v. Lee Optical Company the end result of an Oklahoma Act was to outlaw opticians. A three-judge district court held several features of the Act unconstitutional.[15] *After thoroughly examining the evidence*, the Supreme Court, through Mr. Justice Douglas, reversed the district court on four particular facets, speculating on the evidence in the record that:

" * * * the legislature might have concluded * * * [348 U. S. at page 487, 75 S.Ct. at page 464].

" * * * the legislature may think * * * [348 U.S. at page 489, 75 S.Ct. at page 465].

" * * * the legislature might conclude * * * [348 U.S. at page 490, 75 S.Ct. at page 465].

" * * * it may be deemed important * * * [348 U.S. at page 491, 75 S.Ct. at page 466]."

Therefore, the method of review or test used by the Court was to determine *from the evidence* the legislative purpose or objective and then determine if the "regulation has no *rational relation* to that objective and therefore is beyond constitutional bounds." (Emphasis supplied.) 348 U.S. at page 491, 75 S.Ct. at page 466. This was evident early in its opinion where the court concluded:

" * * * But the law need not be in every respect logically consistent with its aims to be constitution-

15. The district court held *inter alia* that the prevention of opticians from replacing old lenses was unconstitutional, because the regulation was not "reasonably and rationally related to the health and welfare of the people" in that it was purely mechanical and any expert optician could do it, and the regulation constituted an arbitrary interference with the optician's right to do business; that

it was unconstitutional to subject opticians to the Act and to exempt makers of ready-to-wear glasses; and that the section which made it unlawful to solicit the sale of frames or other optical appliances and the section which prohibited the renting of space to people doing eye examinations were also unconstitutional, these having no reasonable relation to public health.

al. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.

"The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. See Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L. Ed. 703; Olsen v. State of Nebraska, 313 U.S. 236, 61 S.Ct. 862, 85 L. Ed. 1305; Lincoln Federal Labor Union No. 19129 [American Federation of Labor] v. Northwestern Iron & Metal Co., 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. 212; Daniel v. Family Sec. Life Ins. Co., 336 U.S. 220, 69 S.Ct. 550, 93 L.Ed. 632; Day-Brite Lighting, Inc. v. State of Missouri, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469. We emphasize again what Chief Justice Waite said in Munn v. State of Illinois, 94 U.S. 113, 134, 24 L.Ed. 77, 'For protection against abuses by legislatures the people must resort to the polls, not to the courts.' " 348 U.S. at pages 487–488, 75 S.Ct. at page 464.

Dantzler v. Callison was an original action brought in the Supreme Court of South Carolina attacking a statute which expressly made it unlawful for anyone other than medical doctors to practice naturopathy. The plaintiffs, who had practiced naturopathy before the act, raised many of the same constitutional issues as were raised in the case at bar. Prefacing that naturopathy is a comparatively new profession and has been recognized "as accepted processes of preventive and curative medicine," the South Carolina court felt constrained to hold the act constitutional as a valid exercise of police power.[16]

Related to Dantzler v. Callison is the case of Hitchcock v. Collenberg where naturopaths sought to have declared unconstitutional the Maryland Medical Practice Act. The Hitchcock case closely parallels the Fife case—the definition of practice of medicine included naturopathy by implication; the applicant was required to take an examination in non-naturopathic subjects; and the Act contained special provisions for the licensing of many other groups other than naturopaths. The district court's opinion followed the Fife case, stating: "This is good law and good sense in Maryland as well as Louisiana." (140 F.Supp. at page 901.)

It must be noted that the three-judge court in the Hitchcock case granted the defendant's motion to dismiss the amended complaint and the Supreme Court affirmed this judgment per curiam, citing Taylor v. State of Oklahoma ex rel. Rutherford, 352 U.S. 805, 77 S.Ct. 33, 1 L.Ed.2d 38; Dantzler v. Callison, 352 U.S. 939, 77 S.Ct. 263; and Dent v. West Virginia, 129 U.S. 114, 9 S.Ct. 231. The case of Taylor v. Oklahoma, Okl., 291

16. The court concluded that the state had properly set as standards for naturopaths the qualifications for medical doctors since naturopaths were known to practice "the use and practice of physiotherapy, minor surgery, obstetrics, gynecology, autotherapy and biologicals" and to specialize in "purifying, cleansing and normalizing human tissues for preservation or restoration of health, according to the fundamental principles of anatomy and physiology." [230 S.C. 75, 94 S.E. 2d 186.] The court restated the familiar principles that it is up to the legislature to set standards for the practice, since the right to practice medicine, surgery, or naturopathy, is a right granted upon condition; that while a state may not prohibit the practice of medicine or surgery, it may, under its police power, regulate within reasonable bounds for the protection of the public health; that while the legislature cannot prescribe, as a condition to the right to practice, knowledge which does not relate to the profession, the legislature does not have to provide for every school of medicine or every school of the healing arts which may exist.

P.2d 1033, appeal dismissed for want of a substantial federal question, 352 U.S. 805, 77 S.Ct. 33, 1 L.Ed.2d 38, raised substantially the same question as Hitchcock v. Collenberg and the Supreme Court of California said that the state's practice act was not unconstitutional for failing to provide for naturopaths.

Every case we have thus far discussed except the Hitchcock case has been decided upon a full record, fully developing the facts and defining the issues. We think it sound judicial policy to decide grave constitutional questions only after the parties have had a full trial and have developed a full evidentiary record. Only this "can provide the concrete factual setting that sharpens the deliberative process especially demanded for constitutional decision" and may even avoid the need for a constitutional decision. United States v. International Union United Auto Aircraft and Agr. Implement Workers, etc., 1957, 352 U.S. 567, 591, 592, 77 S.Ct. 529, 541, 1 L.Ed.2d 563. Only this can present the constitutional issue " 'in clean-cut and concrete form, unclouded.' " Naim v. Naim, 1955, 350 U.S. 891, 76 S.Ct. 151, 100 L.Ed. 784. In a special concurring opinion in Borden's Farm Products Co. v. Baldwin, 1934, 293 U.S. 194, 213, 55 S.Ct. 187, 193, 79 L.Ed. 281, Mr. Justice Stone and Mr. Justice Cardozo stated:

> "We are in accord with the view that it is inexpedient to determine grave constitutional questions upon a demurrer to a complaint, or upon an equivalent motion, if there is a reasonable likelihood that the pro-

duction of evidence will make the answer to the questions clearer."
See also, United States v. Petrillo, 1946, 332 U.S. 1, 6, 67 S.Ct. 1538, 91 L.Ed. 1877; Alabama State Federation of Labor, Local Union No. 103, etc., v. McAdory, 1945, 325 U.S. 450, 460, 463, 65 S.Ct. 1384, 89 L.Ed. 1725; Picking v. Pennsylvania R. Co., 3 Cir., 1945, 151 F.2d 240, 244; United States v. Foster, D.C.1948, 80 F.Supp. 479, 484; Colonial Hardwood Floor Co. v. International Union, United Furniture Workers of America, 1948, 76 F.Supp. 493, 496; Merced Dredging Co. v. Merced County, D.C. 1946, 67 F.Supp. 598, 615.

In review of the cases discussed, supra, it is of interest to note that the Supreme Court has never changed its policy of reviewing with reluctance and self-restraint state regulations in the medical field, even though other state economic regulations have met a fluctuating substantive due process stand.[17]

 We have dwelled at length on the prior case law simply to determine if the law has evolved into allowing the State under its police authority substantially to outlaw an apparently useful and beneficent profession with no showing or proof otherwise, for only if that were possible could we affirm the district court. We determine that the State has no such authority.

Particularly in the field of medicine and the healing art is the State given very broad powers. But the authority to regulate is limited by some constitutional standard and that standard is defined and applied by the courts. The Su-

17. In the early history of the Fourteenth Amendment, state economic regulations were reviewed with a great presumption as to their validity. See cases in note 7, supra. Then, during the first few decades of this century, the Court struck down many of these public health and welfare laws on substantive due process grounds. See Lochner v. State of New York, 1905, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937; Coppage v. State of Kansas, 1915, 236 U.S. 1, 35 S.Ct. 240, 59 L. Ed. 441; Weaver v. Palmer Bros. Co., 1926, 270 U.S. 402, 46 S.Ct. 320, 70 L. Ed. 654. Since then, the tide has turned back to a very expressive "judicial restraint." See supra in the body of this opinion the quote from Williamson v. Lee Optical Company, 348 U.S. at page 488, 75 S.Ct. at page 464. This change in its policy of substantive due process review over state economic regulation is discussed thoroughly in Lincoln Union v. Northwestern Company, 1949, 335 U.S. 525, 535, 536, 537, 69 S.Ct. 251, and Daniel v. Family Security Ins. Co., 1948, 336 U.S. 220, 221, 224, 225, 69 S.Ct. 550, 93 L.Ed. 632.

preme Court of the United States has said that a state may not regulate in this field, when the regulations

> "* * * have no relation to such calling or profession * * *." Dent v. West Virginia, 129 U.S. 114, 122, 9 S.Ct. 231, 233, 32 L.Ed. 623.

> "* * * [have] no real or substantial relation to those objects * * *." Jacobson v. Mass., 197 U.S. 11, 31, 25 S.Ct. 358, 363, 49 L. Ed. 643.

> "* * * are so unreasonable and extravagant as to interfere with property and personal rights of citizens, unnecessarily and arbitrarily * * *." Watson v. Maryland, 218 U.S. 173, 178, 30 S.Ct. 644, 646, 54 L.Ed. 987.

> "* * * are arbitrary or unreasonable attempts to exercise the authority vested in it [legislature] in the public interest." Graves v. Minnesota, 272 U.S. 425, 428, 47 S. Ct. 122, 123, 71 L.Ed. 331.

> "* * * [have] no rational relation to that objective and therefore is beyond constitutional bounds." Williamson v. Lee Optical Company, 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563.

Here, the allegations of the complaining chiropractors certainly place the *application* of the Louisiana Medical Practice Act *to chiropractors* squarely within the above prohibitions.[18]

We give full recognition to the State's power to regulate, reasonably and rationally, all facets of the medical field, even to excluding certain professions or specialists or schools by subjecting them to the rigid requirements of medical doctors or by expressly outlawing them. But the State cannot outlaw an allegedly useful and lawful profession without a "reasonable" or "rational" basis for so doing. The plain-

tiffs say no such basis exists and the defendants say it does. We must, upon motion to dismiss (treated as summary judgment), take the plaintiffs' allegations as true. Thus taken, they make out a prima facie case under existing law. That is the limit to our holding.

Indeed, the burden upon the plaintiffs is great, if not insurmountable. They must show that the Act as administered "has no rational relation" to the regulation of chiropractic and "therefore is beyond constitutional bounds." Williamson v. Lee Optical Company, supra, 348 U.S. 483, 491, 75 S.Ct. 461, 466. For such a determination, it is immaterial whether chiropractic is considered as a school or cult or theory or specialty or profession. That is for the legislature to determine if the plaintiffs prevail in this suit. The petition for rehearing is

Denied.

WISDOM, Circuit Judge (dissenting).

I regret that I cannot go along with the majority of the Court. There is not so much disagreement between us on principle as there is lack of any meeting of the minds as to the scope and effect of the Court's decision. I see the holding in this case as jostling the balance between the states and the federal government. My learned brothers do not see it that way. I respect their judgment and I know that they are concerned as I to avoid any improper extension of the authority of the federal judiciary at the expense of the reserved powers of the states. I feel bound therefore to give some of the reasons for my dissent that were not stated fully in my first opinion, originally prepared as the opinion of the Court.

My brothers expressly repudiate any attempt to supersede the authority of the state legislature; "this Court did not and would not attempt to do so." They see the question as a narrow one: the

18. We lay little import to the allegation that the Act is prima facie unconstitutional as investing the Board with the power to discriminate against chiropractors. Almost the exact wording in the present

Act was found in the statute in Collins v. Texas, supra, 1912, 223 U.S. 289, 32 S.Ct. 287, 56 L.Ed. 439, allowing the Board to determine who were eligible for examination.

question is whether "the plaintiffs are entitled to a day in Court, to an opportunity to prove their case.

"The right to a day in Court" is a powerful cantrip as well as a fundamental maxim of justice. The spell of these words is hard to resist. Here, it is luring us from the broad highway of long accepted principles of law into tangled trails.

I cannot see what purpose will be served by giving the plaintiffs a day in court to prove that chiropractic may be a useful profession and that chiropractors are not surgeons. No one denies that chiropractic may be a useful profession. Or that some intelligent persons go to chiropractors[1] for treatment. Or that chiropractors whose medical activities are restricted by law to adjusting subluxated vertebra by thrusting movements of the hands have no need for a knowledge of surgery and materia medica. To give the plaintiffs a day in Court for the purpose of proving these undisputed facts is to decide the case now for the plaintiffs. It amounts to holding the Louisiana Medical Practice Act arbitrary, unreasonable, and unconstitutional on its face.

In Louisiana State Board of Examiners v. Fife, Douglas v. Noble, Dent v. West Virginia, and Graves v. Noble evidence had to be taken because a critical issue in each case was whether the accused had in fact practiced medicine or dentistry without a license. Remanding this case will only confound the trial judge and confuse the constitutional issue.

Medical practice acts enjoy no immunity from constitutional attack. But a federal court stretches its jurisdiction beyond reasonable limits when it undertakes to say to a state: You must allow chiropractors to take examinations for a medical license, even if they cannot meet the qualifications you consider necessary for all those who practice medicine; in the alternative, chiropractors may practice medicine without a license, free from the warranties a license carries and subject to none of the special restraints legislatures consider necessary for the protection of the public from chiropractors. I do not know where we derive the power to issue such a command. There is no discrimination in statutory standards applied to all candidates for a medical license. We cannot say that the state is acting arbitrarily or unreasonably if it finds a rational connection between medical training at a reputable medical school and the practice of medicine.

Agitation for legislation authorizing licensing of chiropractors is nothing new in Louisiana. The subject comes up at every session of the legislature. It came up in the 1958 session. It is bound to come up again in 1960. It is the sort of problem the state legislature is equipped to handle. For fifty years Louisiana has weighed the merits and demerits of specifically licensing chiropractors. Because of the extremely limited medical training chiropractors receive and because of the attraction the profession of chiropractic has had in the past for quacks, it has seemed good sense to the Louisiana legislature, as to all state legislatures, not to license chiropractors under a general medical practice act unless they meet the same eligibility standards required of all candidates for a medical license; and, to license chiropractors (if at all) only by specific legislation restricting their professional activities and putting the public on notice that a doctor in chiropractic is not a surgeon and not a doctor competent to prescribe drugs. This is within the judgment of the legislature. It is not a judicial question. Louisiana takes its stand with Massachusetts that the dan-

---

1. I use the term "chiropractor" to mean a person trained in a school of chiropractic, but not in a medical school, who is unable or unwilling to meet the eligibility standards for applicants for a license under the Medical Practice Act. Unless the context expresses a different meaning, the term does not include eligible applicants for a doctor's license or licensed doctors who engage in the practice of chiropractic.

676

gers to the public of licensing chiropractors, as such, still outweigh the advantages.

The plaintiffs are in the wrong forum asking for the wrong relief from the wrong lawmaker. The plaintiffs' real complaint is that the legislature has not passed a law making a special exception for their benefit. Exceptions are a matter of legislative grace. It is not for us to supply the omission. The question before us is the limited one of the constitutionality of a particular statute: the reasonableness of educational requirements and other safeguards in the light of the purpose of the statute.

I do not see a federal court as having any right to challenge the purpose of a state law, if the purpose is lawful. The purpose of the Louisiana Medical Practice Act is to regulate the practice of medicine by providing for the licensing of doctors competent to perform surgical operations, deliver babies, and administer drugs. It is not for us to say that the purpose should be broader; that the statute should include provisions for licensing persons to practice medicine who cannot perform surgical operations, deliver babies, and administer drugs. That was not the law the Louisiana legislature passed.

The majority opinion states that the question "is whether they [chiropractors] can be constitutionally excluded from the practice of chiropractic in Louisiana." There is nothing in the statute or in its administration that denies a man the right to practice chiropractic, as such. The plaintiffs are not excluded because they want to be chiropractors or because there is any exclusion of chiropractic as a profession. They are excluded because they can not or will not meet minimum standards fixed by the legislature as necessary and proper in order to be eligible to receive a license to practice medicine. It is common knowledge in Louisiana that there are a number of practitioners specializing in chiropractic. But these practitioners toed the mark set for all applicants who want a license under the Medical Practice Act. I fail to see anything discriminatory in a licensing requirement applicable to all-comers.

I do not understand the majority's statement that the plaintiffs "can claim no right to practice medicine as that practice is engaged in by medical doctors and surgeons." The complaint alleges that the Board of Examiners refuses to accept the plaintiffs as candidates eligible to stand an examination for a medical license, although the plaintiffs have diplomas from chiropractic schools. The plaintiffs allege that this is an unreasonable and arbitrary application of the statute and ask that the Board be enjoined "from so enforcing the statute complained of herein." They ask this Court to order the Board to give them examinations for a license under the Act. In other words, plaintiffs may say that they intend to practice only chiropractic —but in this suit they are demanding the same license issued to surgeons or heart specialists.

A license issued under the Medical Practice Act is a badge with a definite meaning to the public. The meaning is that the holder of such a license is a qualified surgeon and a qualified medical practitioner. It does not seem arbitrary to me that a state legislature should be able to say to its citizens that we shall try to protect you from all incompetent persons (including chiropractors) administering drugs, performing brain surgery, and prescribing cancer cures, by requiring all candidates for a medical license to have received adequate instruction in surgery and materia medica from practicing surgeons and practicing medical doctors associated with a medical college of recognized merit. It seems reasonable to me that the legislature should say, even ability to pass a written examination on surgery is not enough; a man must witness and study surgical operations actually being performed, before he can put up a sign with "Dr." in front of his name. You don't learn surgery by reading about it in a fat book.

The rationale of the Louisiana act is, that there is a reasonable connection be-

tween practicing medicine and requiring candidates for a medical license to have adequate training in medicine, obstetrics, and surgery. If an exception is to be made for certain practitioners, such as for nurses or chiropodists or dentists, special legislation is necessary to protect the public. The experience of other states supports the reasonableness of this view.

*No state allows chiropractors to be issued a license under the general provisions of a medical practice act.* In every state where chiropractors are permitted to practice there is either a special act applicable to chiropractors or special provisions dealing with chiropractors.[2] In all of these states the law, in terms, prohibits chiropractors administering drugs and medicines, performing major or minor surgery, and practicing obstetrics or osteopathy.[3] And in such states a chiropractor may hold himself out only

as a doctor of chiropractic. But the purpose of the licensing provisions of the Louisiana Medical Practice Act is to authorize a person to do the very things a chiropractor is prohibited from doing in the states granting licenses to chiropractors.

Four states—Louisiana, Mississippi, Massachusetts and New York—have no specific provisions licensing chiropractors or other persons to practice medicine according to a special system using no drugs or surgery. Four states—Alabama, Illinois, Ohio and Utah—do not have separate acts, but make special provision for chiropractors in the general medical practice act. Only the Alabama and Ohio acts specifically mention chiropractors; Illinois and Utah, in a general act have separate provisions for "treating human ailments without drugs or medicines and without operative surgery." The license issued in Alabama,

2. Alabama: Title 46, Secs. 258–297, Code of 1940; Alaska: Comp.Laws 1949, Secs. 35–3–21 to 35–3–30; Arizona: Rev.Stat. Secs. 32–901 to 32–927; Arkansas: Stat.1947, Secs. 72–401 to 72–414; California, Secs. 1000–1001, West's Ann. Business and Professions Code; Colorado: Rev.Stat.1953, Secs. 23–1–1 to 23–1–17; Connecticut: Gen.Stat.1949, Supp.1955, Secs. 4378–4387; Supp. 2195d–2197d; Delaware: Title 24, Secs. 701 to 716, Code Ann.; Florida: Stat.Ann. Ch. 460; Georgia: Secs. 84–501 to 84–521, Code Ann.; Idaho: Secs. 54–701 to 54–714, Code 1947; Illinois: Rev.Stat. ch. 91, Secs. 1–16x, S.H.A.; Indiana: Burns' Stat. Secs. 63–1326 to 63–1337; Iowa: Ch. 151, Code Ann.; Kansas: Gen. Stat.1949, Secs. 65–1301 to 65–1311; Kentucky: Rev.Stat.1953, Ch. 312; Maine: Rev.Stat.1954, Ch. 72; Maryland: Secs. 499–514, Ann.Code 1957, art. 43; Michigan: Comp.Laws 1948, Secs. 338.151–338.159; Minnesota: Stat. Ann. Secs. 148.01–148.10; Missouri: Vernon Ann.Stat. Ch. 331; Montana: Secs. 66–501 to 66–517, Rev.Codes 1947; Nebraska: Rev.Stat.1943, Secs. 71–177 to 71–182; Nevada: Comp.Laws 1929, Secs. 1080–1092; New Hampshire: Rev. Stat.1955, Secs. 316:1–316:20; New Jersey: Stat.Ann. Secs. 45:9–41.1 to 45:9–41.16; New Mexico: Stat.1953, Secs. 67–3–1 to 67–3–8; North Carolina: Gen.Stat. Secs. 90–139 to 90–157; North Dakota: Ch. 43–06, Rev.Code 1943;

Ohio: Ch. 4731, Page's Rev.Code; Oklahoma: Stat.Ann. Title 59, Secs. 161–168; Oregon: Rev.Stat. Ch. 684; Pennsylvania: Purdon's Stat. Title 63, Secs. 601–624; Rhode Island: Secs. 5–30–1 to 5–30–17, Gen.Laws 1956; South Carolina: Secs. 56–351 to 56–361, Code 1952; South Dakota: Ch. 27.05, Code 1939, Supp.1952; Tennessee: Secs. 63–401 to 63–420, Code Ann.; Texas: art. 4512b, Vernon's Ann.Civ.Stat.; Utah: Secs. 58–12–1 to 58–12–22, Code Ann. 1953; Vermont: Stat.Rev.1947, Secs. 6757–6770; Virginia: Secs. 54–273 to 54–325, Code 1950; Washington: Remington's Rev.Stat. Secs. 10098–10111; West Virginia: Secs. 2998–3012, Code 1955; Wisconsin: Stat.Ann. Secs. 147.-23–147.26; Wyoming: Comp.Stat.1945, Secs. 37–701 to 37–717.

3. For example: "A license to practice chiropractic granted by the board of examiners shall not confer upon the licensee the right to practice surgery or obstetrics, prescribe, compound or administer drugs or to administer anaesthetics"; Colorado Rev.Stat.1953 ch. 23–1–2. A certificate issued to a chiropractor "shall not entitle him (or her) to practice major surgery or to prescribe or administer drugs"; Alabama Code 1940, Tit. 46, sec. 259. "Chiropractors shall not prescribe or administer medicine to patients, perform surgery, nor practice obstetrics or osteopathy"; Georgia Code Ann. Title 84, Section 509.

Illinois, Ohio and Utah is based on a separate special examination and limits the practice to the system of healing taught at the applicant's school. 41 states have specific acts licensing chiropractors. These acts virtually track the language of the medical practice act of the same state, but set up a special board of examiners and prescribe special educational requirements for chiropractors. In all the 44 states allowing the practice of chiropractic, the license issued to a chiropractor is one that recognizes his limitations, restricts his professional activities, and prevents his holding himself out as a licensee under a general medical practice act.

*Thus, the considered decision of the legislatures of all the states is that chiropractors if licensed at all, should be hedged with restrictions under special statutory provisions.* This is a fair measure of the reasonableness of the Louisiana Medical Practice Act and of the reasonableness of the interpretation placed on the act by the Board of Medical Examiners. Who are we to say that all the states are wrong; that two federal judges have the power to authorize chiropractors to practice medicine without a license and without any of the safeguards forty-nine state legislatures consider necessary for the protection of the public?

There is no decision in the books holding unconstitutional a medical practice act on the ground that the necessary effect of the statute is to exclude chiropractors or other persons whose limited training fails to come up to the standards required of all applicants. There is no decision in the books holding that a licensing board under a general statute acts unreasonably and unconstitutionally if it finds chiropractors ineligible for a general medical license. The Supreme Court of Louisiana has upheld the constitutionality of the act on the very contentions made in this case. The Supreme Court of the United States regarded the question as so well settled that it held recently in a similar case (involving naturopathic practitioners) that there is no federal question. Hitchcock v. Collenberg, 1957, 353 U.S. 919, 77 S.Ct. 679, 1 L.Ed.2d 718.

Few courts have ever admitted that they superseded the authority of a state legislature. That would be judicial lawmaking. The plain fact is, however, that courts do supersede the legislature's authority whenever they substitute their notion of reasonableness for the notion of reasonableness expressed in statutory standards. I do not quarrel with this fact of life. Judicial review of legislation is a vital part of the American governmental system, and federal courts are under a duty to supersede a state's authority whenever, in the opinion of the court, the state's denial of a claimed right is so arbitrary and unreasonable as to amount to a denial of due process or of equal protection of the laws.

The court's duty is obvious when state action violates an express constitutional prohibition or when the Supreme Court has chartered a course lower courts must follow. Here we are on our own. In this case we are fixing a limit to state legislative action by drawing a line, known but to God and us, between what *we* think is reasonable and what *we* think is unreasonable.

In these circumstances I cast my vote for judicial restraint, relying on some well-worn generalizations. First, in the American system of government the judiciary owes a punctilious respect for the actions of the legislative branch. This may mean no more than a presumption of constitutionality. Here, it seems to me, it means that when it comes to deciding what is a reasonable regulation of the practice of medicine, the legislature is not only the appropriate body to make the decision, it is better qualified and has had more experience than the court in handling the problem. Legislators may even be as reasonable as we. Second, the effective working of the federal system depends upon federal courts showing a punctilious respect for state action. That attitude is particularly appropriate when the action is in a sphere traditionally occupied by the states, is of

long standing, and is approved by the highest courts of the state. Here, the state has acted to protect the health of its citizens from the effects of ignorance and deception on the part of persons professing to practice medicine. The statutory safeguards have been in effect for many years and have been approved by the Supreme Court of Louisiana and the Supreme Court of the United States. Short of a manifest, overpowering constitutional violation we should be slow to interfere with such state action. States should regulate their doctors.

This case turns on reasonableness. The reasonableness of local medical regulations is a matter of preeminent concern to the state—to its legislature that is responsible for making the laws and to its courts who are primarily concerned with the validity of the laws. The reasonableness of such a law as the Louisiana Medical Practice Act can be (and has been) determined more appropriately and just as surely and fairly by state courts as by federal courts.

I do not cotton to a federal court allowing chiropractors to come in by the back door when the state legislature and state courts have rejected their credentials at the front door. We chip away at the federal system whenever we assume jurisdiction we do not have. We chip away at the federal system whenever the issue is primarily one for the state to decide and the existence of a federal question is doubtful but could be resolved against assumption of federal jurisdiction.

In Konigsberg v. State Bar of California, 1957, 353 U.S. 252, 77 S.Ct. 722, 734, 1 L.Ed.2d 810, Mr. Justice Frankfurter, dissenting, makes the point: "[Jurisdiction] is a matter of deep importance to the working of our federalism." He quotes Benjamin R. Curtis: "Let it be remembered, also,—for just now we may be in some danger of forgetting it,—that questions of jurisdiction were questions of power between the United States and the several states." 2 Memoir of Curtis, 340–341. And from Mr. Justice Stone: "Due regard for the rightful independence of state govern-

ment, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." Healy v. Ratta, 292 U.S. 263, 270, 54 S. Ct. 700, 703, 78 L.Ed. 1248.

This Court does not have jurisdiction unless there is a federal question. Clearly, unequivocally—or so it seems to me— the United States Supreme Court has held that there is no federal question in a case such as that now before us. Hitchcock v. Collenberg, 1957, 353 U.S. 919, 77 S.Ct. 679, 1 L.Ed.2d 718; Louisiana State Board of Medical Examiners v. Fife, 1927, 274 U.S. 720, 47 S.Ct. 590, 71 L.Ed. 1324. The district court, therefore, correctly declined jurisdiction.

I hope that I misunderstand the effect of the majority opinion. After the plaintiffs prove that chiropractic is a useful profession and that they have no need for surgery, materia medica, and training at a medical school, will the trial judge be compelled to render judgment for the plaintiffs? On appeal, will this Court have been committed to the proposition that there is no rational connection between the practice of medicine and medical training, because some persons in the practice of medicine can make a useful living with their hands and without employing a knowledge of all the medical subjects the legislature regards as necessary for doctors holding a medical license? This Court is now saying to the Louisiana legislature: Chiropractors must be allowed to take examinations for a general medical license, even though they are ineligible under the licensing statute; in the alternative, the statute is unconstitutional, because the eligibility standards are not low enough to permit chiropractors to qualify. Therefore, we, the federal Court of Appeals, authorize chiropractors to practice medicine subject to none of the restrictions Louisiana and 48 other states consider essential for the protection of the public against chiropractors.

I respectfully dissent from the judgment remanding the case for trial and from the order denying a rehearing.